COMMONWEALTH vs. WAYNE GRANT.

Suffolk. March 9, 1994. - June 9, 1994.

Present: LIACOS, ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Interstate Agreement on Detainers. Uniform Criminal Interstate Rendition Act. Extradition and Rendition. Practice, Criminal,* Detainer, Argument by prosecutor, Instructions to jury, Presumptions and burden of proof, Capital case. *Evidence,* Hearsay, Spontaneous utterance. *Homicide.*

A criminal defendant was not entitled to the dismissal of the indictments against him for the prosecutor's failure to comply with the notice requirements of Mass. R. Crim. P. 36 (d) (prosecutor to notify defendant being held out-of-State of charges pending in Massachusetts and right to request a speedy trial), where the defendant had received actual notice of the pendency of the indictments and his right to a speedy trial from correctional authorities while he was incarcerated in another State. [78-80]

The judge at a murder trial properly admitted out-of-court statements of a percipient witness made about an hour after the shooting, where the evidence of the witness's mental state just before and at the time of her interview with police was more than adequate to support the finding that the statements were spontaneous and reliable. [80-82]

At the trial of an indictment for murder, the prosecutor properly used rhetorical questions in closing argument to draw the jury's attention to inferences they could draw from the evidence about the defendant's state of mind at the time of the shooting, and the questions were not improperly directed toward focusing the jury's attention on the defendant's silence at trial. [82-83]

No substantial risk of a miscarriage of justice was created by the judge's single misstatement, if any, in the instruction to the jury on the Commonwealth's burden of proof, where in light of the strong, forceful and correct instructions on burden of proof no reasonable juror could have misunderstood or been misled. [84-85]

INDICTMENTS found and returned in the Superior Court Department on November 22, 1989.

A motion to dismiss was heard by *Patti B. Saris*, J., and the case was tried before her.

*John J. Courtney* for the defendant.

*Austin J. Freeley*, Assistant District Attorney (*Mary K. Ames*, Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J. Following a jury trial, the defendant, Wayne Grant, was convicted of murder in the first degree, assault and battery by means of a dangerous weapon, assault with intent to murder while armed, and carrying a handgun without a license. On appeal, the defendant challenges: (1) the judge's denial of his motion to dismiss for failure to comply with Mass. R. Crim. P. 36 (d) (3), 378 Mass. 909 (1979); (2) the judge's admission of a witness's statement as an excited utterance; (3) the prosecutor's summation; and (4) the judge's instruction on the Commonwealth's burden of proof. We conclude that there was no reversible error. We also conclude that we should not exercise our power under G. L. c. 278, § 33E (1992 ed.), to order a new trial or to enter a lesser degree of guilt on the conviction of murder in the first degree. We affirm the judgments.

1. *The facts.* We set forth the facts in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). For about one year prior to February, 1988, Gary Bass dealt drugs for the defendant, Wayne Grant (also known as Wade Drayton). At some point during this year, Bass also began to deal drugs for someone else. In late January or early February, 1988, the defendant told Bass to stop selling drugs for the other person. Bass did not do so.

On the afternoon of February 3, 1988, the defendant and another man visited the apartment that Bass shared with Alita Hubbard. Hubbard heard the defendant, whom she knew, yell at Bass for continuing to sell drugs for the other person. Hubbard then went to bed. At approximately 1:15 A.M. on February 4, Hubbard awoke. As she made her way to the kitchen, Hubbard saw the defendant and three other men, all of whom she knew, in the living room. They were being un-

usually quiet. When Hubbard asked if anything was wrong, she was told, "Shut up." Hubbard noticed that one of the men with the defendant had a revolver in the waist of his pants.

Hubbard went back to the bedroom where she and Bass prepared to "get high." Before they could, however, a bullet whizzed past Hubbard's head. Hubbard immediately screamed and dived to the floor. Hubbard heard a second shot. She then sat up and faced the doorway where she saw the defendant, Wayne Grant, standing alone a few feet away from her. Hubbard felt Bass's body next to her. The defendant pointed a revolver at Hubbard and fired. Struck in the arm, Hubbard "played dead." The defendant then approached the spot where Hubbard and Bass were lying and fired again. An instant later, the defendant fired another shot which made Bass's body jerk. The defendant then departed.

Shortly after the defendant left the apartment, Hubbard sat up and saw Bass laying beside her. He was bleeding from his right ear. Hubbard continuously called Bass' name, heard no response, and then hollered for help. Boston police Officers John McGee and Anthony Pettus arrived at the apartment at approximately 1:45 A.M. Hubbard told the officers that the defendant had shot both Bass and herself.

Hubbard and Bass were taken to Boston City Hospital. Bass was pronounced dead on arrival.[1] Shortly after her arrival at the hospital, Hubbard was interviewed by Detective Paul J. Murphy. During this interview, Hubbard again identified the defendant as the shooter.

2. *The denial of the defendant's motion to dismiss for failure to comply with Mass. R. Crim. P. 36 (d).* Following the shooting, the defendant fled to New York City, where he was arrested in July, 1988, on an unrelated charge. On November 30, 1988, the defendant was arrested in Baltimore, Maryland, also for an unrelated offense. On or about January 9, 1989, the Commonwealth, pursuant to the Interstate

---

[1] A medical examiner testified that death was caused by "[g]unshot wounds of [the] neck with perforation of [the] spinal cord."

Agreement on Detainers (agreement), St. 1965, c. 892, § 1, lodged a detainer against the defendant with the Maryland Division of Correction. See G. L. c. 276, §§ 11-20R (1992 ed.) (Uniform Criminal Rendition Law); *Gay, petitioner,* 406 Mass. 471, 472-473 (1990); *Commonwealth* v. *Wilson,* 399 Mass. 455, 456 (1987). On January 10, 1989, Maryland authorities filed the detainer against the defendant.

On or about November 17, 1989, when the defendant began to serve his sentence at the Roxbury Correctional Institution in Maryland, authorities there notified him of the murder indictment in Massachusetts. At this time, the defendant signed Form I of the agreement (notice of untried indictment, information, or complaint and of right to request disposition) and checked off the box indicating that he did not wish to file for a speedy trial. On or about February 8, 1990, the defendant informed the classification counselor at the Roxbury Correctional Institution that he still did not wish to file for a speedy trial in Massachusetts. On April 26, 1990, a pretransfer hearing was held in Maryland. In July, 1990, the defendant sought and received a habeas corpus hearing. In August, 1990, the defendant was again advised of his right to request a speedy trial, but he declined to make such a request. On October 18, 1990, the defendant was brought back to the Commonwealth. About one hundred days later, on January 30, 1991, the defendant's trial commenced.

Before the trial, the defendant unsuccessfully moved to dismiss the indictments against him on the ground that, by failing to notify him in writing of the charges against him in Massachusetts and of his right to demand a speedy trial, the Commonwealth violated Mass. R. Crim. P. 36 (d) (3). On appeal, the defendant claims that the denial of his motion to dismiss constituted reversible error. We disagree.

Rule 36 (d) (3) states: "Any person who is detained outside the Commonwealth upon the unexecuted portion of a sentence imposed pursuant to a criminal proceeding, and against whom an untried indictment or complaint is pending within the Commonwealth shall, subsequent to the filing of a

detainer, be notified by the prosecutor by mail of such charges and of his right to demand a speedy trial. . . . If the prosecutor has unreasonably delayed (A) in causing a detainer to be filed with the official having custody of the defendant, or (B) in seeking to obtain the defendant's presence for trial, and the defendant has been prejudiced thereby, the pending charges against the defendant shall be dismissed." The Commonwealth did not mail to the defendant a notice informing him of the charges against him and of his right to demand a speedy trial. However, the Commonwealth did provide such notice to the appropriate Maryland authorities, who, in turn, notified the defendant. Consequently, at all relevant times, the defendant had actual knowledge of his right to demand a speedy trial.

A failure by the Commonwealth to comply precisely with the written notice provision of rule 36 (d) (3) does not require a dismissal of the charges against the defendant if the defendant received actual notice of the charges pending against him in Massachusetts and of his right to request a speedy trial. The purpose of the rule is to make certain that the defendant has knowledge of his right to a speedy trial. Because the defendant received actual notice of his right to a speedy trial, the judge correctly denied the defendant's motion to dismiss.

3. *The admission of Hubbard's statement under the excited utterance exception to the hearsay rule.* The defendant asserts that the trial judge erred in admitting, under the excited utterance exception to the hearsay rule, Detective Murphy's testimony concerning the statements Hubbard made to him approximately one hour after the shooting. We disagree.

The excited utterance exception to the hearsay rule "is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties . . . so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the

senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy . . . and may therefore be received as testimony to those facts." *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 222 (1973), quoting J. Wigmore, Evidence § 1747 (3d ed. 1940). The test to determine the admissibility of a statement under the excited utterance exception to the hearsay rule is as follows. " 'The utterance must have been [made] before there has been time to contrive and misrepresent . . . . [T]he statements need not be strictly contemporaneous with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. . . . [T]here can be no definite and fixed limit of time. Each case must depend upon its own circumstances.' . . . The trial judge in determining whether an utterance meets the tests of admissibility ought to be given broad discretion. . . . [O]nly in clear cases . . . of an improper exercise of discretion should [the judge's] ruling be revised." *Rocco* v. *Boston-Leader, Inc.,* 340 Mass. 195, 197 (1960), quoting J. Wigmore, Evidence § 1750 (3d ed. 1940). See *Commonwealth* v. *Burnett,* 417 Mass. 740, 743-744 (1994); *Commonwealth* v. *Crawford,* 417 Mass. 358, 362 (1994); *Commonwealth* v. *McLaughlin, supra* at 223. See also P.J. Liacos, Massachusetts Evidence § 8.16, at 516-520 (6th ed. 1994).

The question whether the judge properly admitted Detective Murphy's testimony turns on whether, during the approximately sixty minutes which elapsed between the time of the shooting and the time of the interview, Hubbard was capable of reflecting sufficiently on the incident to contrive a false story. The facts before the judge were as follows. One hour before she talked with Detective Murphy, Hubbard witnessed her boy friend's murder. Hubbard herself was shot in the elbow and "played dead" to survive. After the killer fled, Hubbard turned to see her boy friend's bloody body. She frantically screamed his name over and over again in the hope of rousing him. Then, while holding her wounded arm

with her free arm, she kicked on the doors of her neighbors' apartments to summon help. When Officers McGee and Pettus arrived, they found Hubbard screaming on the second-floor landing. Soon after the officers came on the scene, emergency medical technicians (EMTs) arrived. The officers questioned Hubbard about the shooting while some of the EMTs treated her and while other EMTs carried Bass' body past her. The officers described Hubbard as being "close to hysterical" as she answered their questions. Shortly after their arrival, the EMTs rushed Hubbard to the emergency floor at Boston City Hospital, where, while being treated by a number of doctors and nurses, she was interviewed by Detective Murphy.

The evidence concerning Hubbard's mental state just before and at the time of her interview with Detective Murphy provides more than adequate support for the judge's determination to admit Murphy's testimony as an excited utterance.

4. *The prosecutor's closing argument.* To obtain a conviction of murder in the first degree, the prosecutor had to prove, beyond a reasonable doubt, that the defendant killed Gary Bass with deliberately premeditated malice aforethought. See G. L. c. 265, § 1 (1992 ed.). To this end, the prosecutor argued in her summation that one's actions often reflect one's intent. See *Commonwealth* v. *Lamothe*, 343 Mass. 417, 419-420 (1961). Through rhetorical questions, the prosecutor then invited the jurors to examine the defendant's intent at the time of the shooting. The prosecutor worded the questions as follows. "Now ask yourselves, ladies and gentlemen, what was in the mind of [the defendant] on February fourth 1988 as he took that revolver and stepped into the door frame? . . . What was in his mind as he stood and shot not ten feet away from two targets, two living, breathing human beings? What was in his mind as he pulled back the trigger, sending the bullet that went ripping into the neck and spine of [the murder victim]? What was in his mind as he . . . fired . . . directly into [the assault victim]? What was in his mind when he came even closer to [the mur-

der victim], pulling back the trigger and shooting the final shot with accuracy and precision, two shots, one and a half inches away from one another?"

At the close of the prosecutor's summation, the defendant moved for a mistrial, contending that the rhetorical questions posed by the prosecutor constituted an impermissible comment on his decision to not testify and, therefore, impermissibly shifted the burden of proof. The judge denied the defendant's motion. On appeal, the defendant challenges the denial of this motion.

It is well settled that a defendant "has the right to remain passive, and to insist that the Commonwealth prove its case beyond a reasonable doubt without explanation or denial by him." *Commonwealth* v. *Madeiros*, 255 Mass. 304, 307 (1926). A prosecutor cannot refer, even inferentially, to the defendant's decision not to testify. See *Commonwealth* v. *Hawley*, 380 Mass. 70, 82-84 (1980); *Commonwealth* v. *Domanski*, 332 Mass. 66, 69 (1954). However, it is equally well settled that a prosecutor may ask the jury rhetorical questions that touch on the defendant's constitutional right not to incriminate himself without violating that right provided the questions are not "of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify." *Commonwealth* v. *Smallwood*, 379 Mass. 878, 892 (1980), quoting *United States* v. *Armedo-Sarmiento*, 545 F.2d 785, 793 (2d Cir. 1976), cert. denied, 430 U.S. 917 (1977); *Commonwealth* v. *Hartman*, 404 Mass. 306, 317 (1989).

The prosecutor's questions were directed toward focusing the jury's attention on the inferences they could draw concerning the defendant's state of mind at the time of the shooting. The questions were not directed toward focusing the jury's attention on the defendant's silence at trial. The rhetorical questions posed by the prosecutor were not "of such a nature that a jury would naturally and necessarily construe them to be directed to the failure of the defendant to testify." There was no error.

5. *The judge's instruction concerning the Commonwealth's burden of proof.* During her instructions to the jury, the judge stated as follows: "This presumption of innocence is a rule of law that compels you to find the defendant not guilty unless and until the Commonwealth produces evidence from whatever source that proves that he is guilty beyond a reasonable doubt. . . . The burden of proof is never on the defendant. The defendant is not required to call any witnesses or produce any evidence since he is presumed to be innocent." The judge then misstated the Commonwealth's burden of proof by saying, "The presumption of innocence stays with the defendant unless and until the evidence convinces you unanimously as a jury that the defendant is guilty beyond a reasonable doubt. *It requires you to find him guilty unless his guilt has been proved beyond a reasonable doubt*" (emphasis added).[2] Immediately after she misspoke, the judge stated: "Your verdict must be unanimous. I will get to that in a minute, but I want to emphasize that it must be twelve of you who decide whether or not [the defendant] is guilty beyond a reasonable doubt. I want to remind you also, remember we had all those questions at the beginning when we impaneled as a jury and all of you swore to me that you could apply this presumption of innocence to [the defendant], I want to remind you of that oath now." As she continued on with her instructions, the judge repeatedly stressed the Commonwealth's burden of proving each element of the crimes beyond a reasonable doubt.

After completing her instructions to the jury, the judge asked the counsel if they were content with the instructions. Neither party pointed out the judge's slip of the tongue. Because the defendant did not object to the judge's instruction, "the applicable standard is whether, on review of the entire record, as considered in light of the verdict returned by the jury, a substantial likelihood exists that a miscarriage of jus-

---

[2] At oral argument, the attorneys said that they did not ask the stenographer to check her notes and they did not ask the judge to hold a hearing on the accuracy of the transcription. Nor did they request a copy of the instructions the judge read to the jurors.

tice has occurred." *Commonwealth* v. *Skinner*, 408 Mass. 88, 92 (1990). See *Commonwealth* v. *Cordle*, 412 Mass. 172, 178 (1992); G. L. c. 278, § 33E.

We assume, without deciding, that the judge did, at one point during her instructions to the jury, misstate the burden of proof by omitting the word "not" before the word "guilty." However, "the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). "Error in a charge is determined by reading the charge as a whole, and not by scrutinizing bits and pieces removed from their context." *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). See *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990); *Commonwealth* v. *Matthews*, 406 Mass. 380, 390 (1990). The judge's charge was strong and forceful on the Commonwealth's burden of proof. The judge's misstatement contradicted not only the general theme of her instructions but also was inconsistent with the specific portions of her instructions which immediately preceded and succeeded it. A reasonable juror could not have misunderstood or have been misled by this slip of the tongue. See *Commonwealth* v. *Amaral*, 389 Mass. 184, 194-195 (1983). Cf. *Commonwealth* v. *Wood*, 380 Mass. 545, 550 (1980). Consequently, we conclude that this misstatement does not pose a substantial likelihood of a miscarriage of justice.

6. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the record as a whole and conclude that there is no reason either to order a new trial or to enter a verdict of a lesser degree of guilt on the conviction of murder in the first degree.

*Judgments affirmed.*