## Commonwealth *vs.* Thomas Mercado.[1]

Plymouth. April 5, 2013. - August 7, 2013.

Present: Ireland, C.J., Cordy, Botsford, Duffly, & Lenk, JJ.

*Homicide. Practice, Criminal,* Assistance of counsel, Motion to suppress, Public trial, Immunity from prosecution, Instructions to jury, Presumptions and burden of proof, Capital case. *Constitutional Law,* Public trial, Burden of proof. *Witness,* Immunity. *Due Process of Law,* Burden of proof.

A Superior Court judge properly denied the murder defendant's motion for a new trial, in which the defendant alleged his trial counsel was ineffective in preparing and presenting a motion to suppress the defendant's statement to police, where, if there was an error, it was on the part of the judge hearing the motion to suppress (motion judge), and not on the part of counsel; and where, assuming without deciding that the motion judge erred in denying the motion, such error did not create a substantial likelihood of a miscarriage of justice, in that there was strong evidence, from several different sources, supporting the conclusion that the defendant was the person who shot and killed the victim; and in that the trial record contained other evidence of consciousness of guilt apart from the challenged statement. [145-151]

At a criminal trial, the judge's order to close the court room for a hearing to consider the Commonwealth's motion to grant immunity to a scheduled trial witness did not violate the defendant's right to a public trial under the Sixth Amendment to the United States Constitution, in that a defendant has no right to be part of the process in which a witness's claim of a privilege under the Fifth Amendment to the United States Constitution is considered. [151-152]

At a criminal trial, misstatements in the judge's otherwise correct instructions to the jury concerning the Commonwealth's burden of proof with respect to murder on the theories of deliberate premeditation and extreme atrocity or cruelty did not create a substantial likelihood of a miscarriage of justice, where a reasonable juror could not have misunderstood or have been misled by the judge's slips of tongue. [152-154]

This court declined to exercise its authority under G. L. c. 278, § 33E, to order a new trial, where, although there was insufficient evidence from which the jury could have found the defendant guilty of murder in the first degree on the theory of felony-murder with armed robbery as the predicate felony, the evidence was more than sufficient to support the jury's conclusion that the defendant killed the victim with deliberate premeditation and extreme atrocity or cruelty. [154-155]

---

[1]As is our custom, we refer to the defendant by the name appearing in the indictment.

INDICTMENT found and returned in the Superior Court Department on June 1, 2006.

A pretrial motion to suppress evidence was heard by *Carol S. Ball*, J.; the case was tried before *John P. Connor*, J., and a motion for a new trial was considered by him.

*Stephen Paul Maidman* for the defendant.

*Carolyn A. Burbine*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. A Superior Court jury found the defendant, Thomas Mercado, guilty of murder in the first degree; the jury reached their verdict on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder. Before us is the defendant's appeal from his conviction and the denial of his motion for a new trial. The defendant claims that (1) his trial counsel[2] was ineffective in preparing and presenting his motion to suppress his statement to police; (2) the judge violated his right to a public trial by closing the court room during a witness immunity hearing; and (3) the judge's instructions on the Commonwealth's burden of proof were erroneous. The defendant also argues that in the circumstances of this case, this court should exercise its power under G. L. c. 278, § 33E, and order a new trial. Although we conclude, in reviewing the case under § 33E, that the evidence was insufficient to support the defendant's conviction on the theory of felony-murder, we affirm the defendant's conviction on the theories of deliberate premeditation and extreme atrocity or cruelty, and also affirm the denial of his motion for a new trial.

*Background.* We recite the facts as the jury could have found them, reserving other facts for later discussion. The victim was shot and killed sometime on the night of February 6, 2006, or the early morning of February 7, 2006, in an apartment building in Brockton. The evidence of the incident itself, introduced through the testimony of four different witnesses who were present at the shooting, all of whom had been granted immunity pursuant to G. L. c. 233, § 20E, centered on the interaction of various individuals in two apartments on the second floor of the building, the second-floor common hallway, and a stairway

---

[2]New counsel has represented the defendant on appeal and in connection with his motion for a new trial.

leading down from that floor. One apartment was that of Jeannette Martinez, and the other apartment was Ivan Correia's.

On February 6, 2006, Martinez was in her apartment with Corrin Cripps. Both women frequently used "crack" cocaine, and they had spent that day smoking it together in Martinez's bathroom. At some point that evening, Cripps went next door to Correia's apartment because she believed she was owed cocaine in payment for sexual favors she had provided the night before to one of the men in that apartment. When she entered, the victim, his brothers Jair Barros and Michael Gomes, and Correia were in the apartment. The men were seated at a table, putting cocaine into bags, and there was a black gun on the table. Cripps ingested a line of cocaine, and then returned to Martinez's apartment.

By that time, the defendant, whom Cripps had known for three or four years, had arrived at Martinez's apartment with his "cousin" Pelon, who was Martinez's drug supplier. There was a knock on Martinez's apartment door, and two of the men from Correia's apartment — Correia and Barros — asked for scissors and baking soda, implements they needed for their cocaine packaging operation. Cripps opened the door and handed one of them baking soda from Martinez's kitchen, and the men left. The defendant asked Cripps what the men were doing in Correia's apartment, and Cripps answered that she did not know but that there was cocaine on the table. The defendant asked her to "[g]o over there and see." Cripps believed the defendant wanted to rob the men in Correia's apartment.

Despite the defendant's request, Cripps did not go to Correia's apartment at that moment, but instead went into Martinez's bedroom for about thirty minutes. Martinez was also in the bedroom smoking crack cocaine. When Cripps ultimately emerged from the bedroom, she went into the kitchen to find the defendant, Pelon, and a third man unknown to Cripps standing together talking. From the bedroom, Martinez heard the defendant tell Pelon that "they were going to kill the guy."[3] The third man left the apartment shortly after the discussion in the kitchen.

At some point, there was another knock at Martinez's apart-

---

[3] Cripps testified that she could not hear anybody talking in the kitchen when she was in the bedroom. She was not asked whether she heard any part of a conversation when she went into the kitchen.

ment door, and the people knocking asked for a razor and baggies.[4] The defendant was standing near the door at the time, and said, "You ain't getting dick. Have your momma go buy you some baggies." Thereafter, Cripps again left Martinez's apartment and returned to Correia's apartment. Sometime later, Cripps left Correia's apartment to go back to Martinez's apartment, and as she walked out, the victim, his brother Gomes, and Correia were behind her. The defendant, who was wearing a sweatshirt with the hood up, was standing in the hallway against the wall.

When Gomes stepped into the hallway, he saw the defendant and also noticed a second man on the stairs who appeared to be approaching him. Gomes and the second man began to fight, in the course of which they fell together down the stairs. As they fell, Gomes heard five or six gunshots behind him. Barros, who was still inside Correia's apartment, also heard five gunshots. Barros opened the apartment door to the hallway and saw a hand point the gun and shoot the victim in the face. Cripps, who had walked into Martinez's apartment and closed the door after leaving Correia's apartment, heard "boom, boom, boom, boom, boom" coming from outside the apartment. Meanwhile, after Pelon had left, Martinez looked through the peephole in her apartment door and saw the defendant, whom she had seen with a gun in the apartment, standing in the hallway. Martinez saw the defendant shoot a gun and run off.

After the fight in the stairway, when Gomes was on the first floor of the building, he saw the defendant descending the stairs wearing a hood and holding something in his hand. Gomes ran outside, and the defendant followed him and then turned and ran. In the meantime, Barros sought to tend to the victim, who was slouched on the floor of the second-floor hallway with multiple gunshot wounds and bleeding heavily.

The victim sustained a total of six gunshot wounds, including fatal wounds to his neck and abdomen. Six casings, all fired

---

[4]There was conflicting testimony at trial regarding the visits made by Correia and Barros to Martinez's apartment. Cripps testified that they knocked on Martinez's door on two occasions, and that she handed them baking soda on the first visit, while Barros testified that he and Correia only went to Martinez's apartment once and that they returned to Correia's apartment to wait for Cripps to bring the scissors and baking soda to them. The discrepancy is not material to our consideration of the case.

from the same weapon, were discovered in the second-floor hallway, and bullet fragments were found on the hallway floor, in one of the walls, in a closet in an adjacent apartment, and underneath a bloodstained portion of the hallway rug.

The defendant's trial took place in June, 2009. While his direct appeal was pending in this court, the defendant, represented by new counsel, filed a motion for a new trial on October 6, 2011. In March, 2012, the judge, who had also been the trial judge, denied the motion without an evidentiary hearing. The defendant timely appealed, and the consolidated appeals from his conviction and the denial of his motion for a new trial are now before this court.

*Discussion.* "When this court reviews a defendant's appeal from the denial of a motion for a new trial in conjunction with his direct appeal from an underlying conviction of murder, we review both under G. L. c. 278, § 33E." *Commonwealth* v. *Alicea*, 464 Mass. 837, 840 (2013), citing *Commonwealth* v. *Gomez*, 450 Mass. 704, 711 (2008).

1. *Ineffective assistance of counsel.* The defendant challenges the denial of his motion for a new trial, in which he claimed ineffective assistance of trial counsel in preparing and presenting a pretrial motion to suppress the testimony of Robert Clements, a Massachusetts State police trooper who interviewed the defendant in Puerto Rico. The background facts are these. The defendant filed the motion to suppress on December 2, 2008, on the ground that the interview in Puerto Rico about which Clements would testify constituted an unlawful interrogation in violation of the defendant's rights under art. 12 of the Massachusetts Declaration of Rights. The defendant's trial counsel included in his affidavit that accompanied the motion information that the defendant, who was at the time serving a sentence at a prison in Puerto Rico, had been interviewed away from the prison at a Puerto Rico office of the Federal Bureau of Investigation (FBI) by at least three law enforcement members, including a representative from the FBI, the Massachusetts State police, and the Brockton police department.

On the first day of the hearing on the defendant's motion to suppress, Clements testified that he had interviewed the defendant for several hours in "an office setting" in a prison where

the defendant was serving a sentence for a shooting in Puerto Rico, that the defendant was wearing wrist and ankle cuffs for the duration of the interview, and that none of the officers present read the defendant his Miranda rights at any point during the interview.

On the second day of the hearing, the prosecutor and the judge, who was not the trial judge, stated their shared impression that the interview had taken place at the prison. Defense counsel argued strenuously that the interview had instead taken place at an office of the FBI. In response, the motion judge stated, "I'm not sure that . . . makes much of a difference" and that she did not see the significance of "whether the interview happened in prison or in another building" because either way "he's in custody with the prison officials." Nonetheless, in her memorandum of decision denying the defendant's motion to suppress, the motion judge found as a fact that the defendant was interviewed in an office at the prison. She concluded that "[n]othing in the evidence adduced suggests that there was any coercive aspect to the interrogation of [the defendant] other than the normal restraints incident to incarceration" and, therefore, Miranda warnings were not required under *Commonwealth v. Larkin*, 429 Mass. 426, 432-436 (1999) (*Larkin*). Thereafter, at trial, Clements testified that he had met the defendant in Puerto Rico, where the defendant was using the name "Ariel Rivera," and that when asked whether his name was Thomas Mercado, the defendant replied, "No."[5] In his closing argument, the prosecutor argued that the defendant's presence in Puerto Rico and his use of the name "Ariel Rivera" were evidence of consciousness of guilt. The trial judge also included an instruction on consciousness of guilt in his final charge.

In connection with his motion for a new trial, the defendant presented by affidavits, and the judge[6] accepted, the following account of the circumstances surrounding the Puerto Rico interview. After the February, 2006, shooting, the defendant went to Puerto Rico, where he was incarcerated in a Federal

---

[5]The Commonwealth introduced no other evidence of the defendant's statements during the Puerto Rico interview, and there was no evidence presented concerning the fact of the defendant's incarceration in Puerto Rico or the location where Clements and the defendant encountered each other.

[6]The trial judge heard and ruled on the defendant's motion for a new trial.

prison under the name "Ariel Rivera." A fingerprint comparison analysis by the FBI disclosed that the fingerprints of "Ariel Rivera" matched those of the defendant. On March 5, 2007, officers from the Brockton police department and the Massachusetts State police traveled to Puerto Rico to interview the defendant. The following morning, the defendant was transported to the local FBI office for an interview during which he was kept in handcuffs and ankle cuffs. This was in contrast to the conditions in the prison in which the defendant was incarcerated, where the defendant was permitted to walk freely without restraints around his cell area and in common areas of the prison. During the interview at the FBI office, the officers present questioned the defendant for approximately two hours about the Brockton shooting. The defendant never was given Miranda warnings, and the interview only ended when the defendant said he wanted a lawyer.

In this appeal, the defendant argues that his trial counsel was ineffective, contending that if counsel properly had investigated the circumstances of the defendant's interview and conveyed to the motion judge that the interview occurred at the FBI office, and not at the prison, the judge would have allowed the defendant's motion to suppress. Where, as here, a defendant has been convicted of murder in the first degree, "we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel." *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 808 (2005), citing *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Under this standard, "we consider a defendant's claim even if the action by trial counsel does not constitute conduct 'falling measurably below that . . . of an ordinary fallible lawyer.' " *Commonwealth* v. *Gonzalez*, *supra* at 808-809, quoting *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992). We are bound to "consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, *supra*.

Although our review under § 33E extends beyond counsel's

conduct, we note as an initial matter that we are not persuaded by the defendant's contention that his trial counsel's performance was deficient. Trial counsel argued to the judge hearing the motion to suppress the fact that the defendant was interrogated at the FBI office in Puerto Rico, and not at the prison, and he included specific reference to the available evidence supporting this view in his affidavit filed in support of the motion. Further, trial counsel explained quite specifically to the judge the theory why the interrogation was custodial for Miranda purposes even under the standard set forth in *Larkin*, 429 Mass. at 434-436.[7] Even if trial counsel had sought to introduce evidence at the motion hearing to confirm the interview's location — as the defendant on appeal contends counsel was obligated to do — the record suggests that the defendant was not likely to have prevailed on the motion to suppress, given the motion judge's statement during the hearing that she did not think the location of the interview would have made a difference in her ruling. We thus agree with the judge's observation in his decision denying the defendant's motion for a new trial that "if there was an error it was on the part of the motion judge" and not on the part of counsel.[8]

Although the defendant does not challenge on appeal the merits of the judge's ruling on the motion to suppress, we are obligated to do so pursuant to our duty under § 33E. See *Com-*

---

[7]The defendant contends that trial counsel also was ineffective because he was unfamiliar with this court's decision in *Commonwealth* v. *Larkin*, 429 Mass. 426, 434-436 (1999) (*Larkin*), relating to custodial interrogations of prisoners. Although the record reflects that counsel may have been unaware of the *Larkin* case on the first day of the suppression hearing, on the second day, trial counsel announced that he had read *Larkin*, and argued the motion in accordance with the standard set forth in that case.

[8]The defendant assigns error to the trial judge's failure to hold an evidentiary hearing on his motion for a new trial. "An evidentiary hearing is required if the motion and affidavits raise a substantial issue." *Commonwealth* v. *Britto*, 433 Mass. 596, 608 (2001), citing Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). "The decision to hold an evidentiary hearing on a motion for a new trial is a matter committed to the sound discretion of the trial judge." *Commonwealth* v. *Britto, supra,* citing *Commonwealth* v. *Licata*, 412 Mass. 654, 660 (1992). The trial judge acted within his discretion when he denied the defendant's motion for a new trial without a hearing. As we have discussed, the motion and affidavits did not cast doubt on the effectiveness of counsel's performance, which was the only issue raised in the defendant's motion for a new trial.

*monwealth* v. *Wright*, 411 Mass. at 682. Cf. *Commonwealth* v. *Brum*, 438 Mass. 103, 106 n.4 (2002) (where defendant does not challenge on appeal correctness of ruling on motion to suppress, court "review[s] the judge's ruling pursuant to . . . duty under G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice"). Assuming, without deciding, that the motion judge erred in denying the defendant's motion to suppress,[9] such error did not amount to a substantial likelihood of a miscarriage of justice in this case. The Commonwealth's case was strong independent of the defendant's statement denying that he was Thomas Mercado; in particular, there was a substantial amount of evidence, from several different sources, supporting the conclusion that the defendant was the

---

[9]In *Larkin*, this court explained that an interrogation is custodial if, in the totality of the circumstances, "the prisoner would reasonably believe himself to be in custody beyond that imposed by the confines of ordinary prison life." *Larkin*, 429 Mass. at 435, quoting *People* v. *Margolies*, 125 Misc. 2d 1033, 1041 (N.Y. Sup. Ct. 1984). See *Commonwealth* v. *Smith*, 456 Mass. 476, 478-480 (2010); *Commonwealth* v. *Girouard*, 436 Mass. 657, 665-666 (2002). In denying the defendant's motion for a new trial, the trial judge noted that "if there was an error[,] it was on the part of the motion judge" because "being brought to the [Federal Bureau of Investigation (FBI)] headquarters and questioned about a murder in Massachusetts amounted to creating a custodial setting" under *Larkin*. The record appears to support this conclusion: the defendant was transported from a prison in Puerto Rico where he was permitted to move freely around his cell and common areas, to the FBI, where, without any notice and while wearing handcuffs and ankle cuffs, he was interviewed for two hours by representatives of multiple law enforcement agencies concerning a murder in Massachusetts.

Even if the interview were custodial under *Larkin*, however, there is some question whether the information elicited at trial — the defendant's statement during the interview that he was Ariel Rivera and not Thomas Mercado — fell within the " 'routine booking question' exception [that] 'exempts from *Miranda*'s coverage questions to secure the biographical data necessary to complete booking or pretrial services.' " *Commonwealth* v. *Woods*, 419 Mass. 366, 372-373 (1995), quoting *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601 (1990) (opinion of Brennan, J.). But see *Commonwealth* v. *Clark*, 446 Mass. 620, 628 n.6 (2006), and cases cited (declining to decide whether police may ask arrested persons for aliases as part of routine booking procedure without first giving Miranda warnings, where inquiry is intended to elicit inculpatory response). However, we need not decide whether the interview was custodial and, if so, whether the defendant's statement at the interview falls within the routine booking question exception, because, for the reasons we discuss next in the text, we are unable to conclude that the denial of the motion to suppress, even if erroneous, was likely to have affected the jury's disposition.

person who shot and killed the victim.[10] Furthermore, the trial record contains other evidence of consciousness of guilt apart from the challenged testimony of Clements. Cf. *Commonwealth* v. *Powell*, 459 Mass. 572, 583 (2011), cert. denied, 132 S. Ct. 1739 (2012) (no ineffective assistance where other evidence from which fact finder could infer consciousness of guilt). Both Clements and the defendant testified that the defendant was in Puerto Rico after the shooting,[11] testimony that, if believed, permitted the jury to infer the defendant fled to Puerto Rico. See *Commonwealth* v. *Carrion*, 407 Mass. 263, 277 (1990), and cases cited ("Flight is perhaps the classic evidence of consciousness of guilt"); *Commonwealth* v. *Toney*, 385 Mass. 575, 583 (1982) ("Evidence that a person flees from the scene of a crime or from his usual environs may be probative of a consciousness of guilt regardless of whether he has actual knowledge that he is being sought by the police"). In such circumstances, we are unable to

---

[10]While the defendant contends that the Commonwealth's witnesses were of "dubious credibility," the record reflects that the testimony of witnesses from both apartments concerning the shooting and surrounding circumstances was consistent and presented a solid basis on which the jury could conclude that the defendant was the shooter. For example, Cripps testified that she had seen the defendant, whom she had known for three or four years, in Martinez's apartment on the evening of the shooting, and that the defendant was standing in the hallway immediately before she heard sounds consistent with a gun being fired. Gomes also testified to seeing the defendant in the hallway and further that after the shooting, when Gomes was at the bottom of the stairs struggling with the second man, he saw the defendant come down the stairs with something in his hand, go outside, and run away from the building.

Additionally, in Martinez's grand jury testimony, which was introduced substantively at trial, she recounted that she heard the defendant say "they were going to kill the guy" and later heard Pelon tell the defendant to "take care of killing him, that he . . . had to kill the guy." Her grand jury testimony further related that, like Cripps and Gomes, she saw the defendant standing in the hall just before the shots were fired — and that she actually saw him shoot a gun. Although aspects of Martinez's trial testimony at times were internally inconsistent and in conflict with her testimony before the grand jury, it was in some important respects consistent with other witnesses' testimony about the defendant's presence and location at the time and place of the shooting.

[11]Clements's testimony to the effect that he saw the defendant in Puerto Rico after the shooting was admissible notwithstanding any questions concerning the propriety of his testimony recounting the statement allegedly made by the defendant at the FBI office in Puerto Rico that his name was Ariel Rivera, not Thomas Mercado.

conclude that suppression of the challenged testimony would likely have affected the jury's conclusion.

2. *Closure of witness immunity hearing.* The defendant argues that his right to a public trial guaranteed by the Sixth Amendment to the United States Constitution was violated when the judge ordered the court room closed for a hearing to consider the Commonwealth's motion to grant immunity to a scheduled trial witness. We summarize the relevant facts. On the first day of trial, before empanelment of the jury, the trial judge heard a petition presented by the Commonwealth pursuant to G. L. c. 233, § 20E, for an order granting immunity to Michael Gomes. At the prosecutor's request, the judge stated, "Clear the courtroom," and asked the defendant and his lawyer to step out of the court room for the duration of the hearing. The judge permitted the defendant and his lawyer to reenter the court room as soon as the hearing was concluded.

Because the defendant did not object at trial, we review for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Dyer*, 460 Mass. 728, 735-737 nn.7 & 8 (2011), cert. denied, 132 S. Ct. 2693 (2012). Under G. L. c. 233, § 20E (*b*), which establishes the procedures for witness immunity applications, hearings on these petitions "shall not be open to the public." Undaunted by this clear statutory directive, the defendant contends that § 20E (*b*) is unconstitutional to the extent that it violates his Sixth Amendment right to a public trial. We disagree. This court repeatedly has stated that "[t]he statutory procedure for a grant of immunity is designed to accommodate the witness's rights and the State's need for evidence. The statute is simply not addressed to the interests of defendants." *Commonwealth* v. *Figueroa*, 451 Mass. 566, 578 (2008), quoting *Smith* v. *Commonwealth*, 386 Mass. 345, 349 (1982). "A defendant has no right to be part of the process in which a witness's claim of a [privilege under the Fifth Amendment to the United States Constitution] is considered. The hearing is held for reasons totally independent of the proceeding against the defendant, and the privilege is that of the witness." *Commonwealth* v. *Clemente*, 452 Mass. 295, 318 (2008), cert. denied, 555 U.S. 1181 (2009), citing *Commonwealth* v. *Simpson*, 370 Mass. 119, 121 (1976). Cf. *Commonwealth* v. *Alicea*, 464 Mass. 837, 842 (2013)

("insofar as the hearing may be characterized as the first part of an immunity application process under G. L. c. 233, § 20E, . . . exclusion of the defendant and defense counsel would be appropriate"). Additionally, in this case, there were a total of six witnesses concerning whom the Commonwealth petitioned for a grant of immunity pursuant to § 20E. A judge in the Superior Court, who was not the trial judge, heard and granted five of the six petitions before the trial started, and the record contains no indication that the defendant or members of the public were present when this occurred. The only reason that the Commonwealth's immunity petition for Gomes was not considered at the same time is that Gomes failed to appear in court on that day, although he had been subpoenaed. That the petition relating to Gomes was heard and allowed on the same day as trial was simply coincidental, and, in any event, the hearing on the petition occurred before the jury were empanelled, underscoring the point that hearings on witness immunity petitions under § 20E are simply not a part of the criminal trial process. The closed hearing on the witness immunity application thus did not violate the defendant's right to a public trial.

3. *Judge's instruction concerning Commonwealth's burden of proof.* The defendant argues that the trial judge's instructions to the jury regarding murder on the theories of deliberate premeditation and extreme atrocity or cruelty misstated the Commonwealth's burden of proof in violation of the due process clause of the Fourteenth Amendment to the United States Constitution and art. 12.

At the outset of his final charge to the jury, the judge stated repeatedly that the Commonwealth bears the burden of proof on each theory of murder. Instructing on the theory of deliberate premeditation, the judge then explained: "In order to find the defendant guilty of murder in the first degree with deliberate premeditation, the Commonwealth must prove three elements beyond a reasonable doubt." The judge next correctly stated the Commonwealth's burden to prove each element, but immediately thereafter stated: "If after considering all the evidence in this case you conclude that *the defendant [sic] has proved beyond a reasonable doubt each of these three elements* I've just defined . . . then you should find the defendant guilty of murder in the

first degree committed with deliberate premeditation. If after your consideration of all the evidence you find *the defendant has not proved one of these three elements beyond a reasonable doubt,* you must not convict the defendant of murder in the first degree on the theory of deliberate premeditation" (emphases added).

Turning to the theory of extreme atrocity or cruelty, the judge instructed: "In order to prove the defendant guilty of first-degree murder committed with extreme atrocity or cruelty, the Commonwealth must prove three elements beyond a reasonable doubt . . . ." The judge correctly stated the Commonwealth's burden with respect to each separate element, but then stated: "In deciding whether *the defendant has proved beyond a reasonable doubt* that the defendant caused the death of the deceased with extreme atrocity and cruelty, you must consider the presence and degree of the following factors . . ." (emphasis added). The judge then instructed: "If . . . you find the Commonwealth has proved beyond a reasonable doubt these three elements I've just defined . . . then you should find the defendant guilty of murder in the first degree committed with extreme atrocity or cruelty. If, however, . . . you find the Commonwealth has not proved one or any of these three elements beyond a reasonable doubt, then you must find the defendant *guilty* of murder in the first degree, based on the theory of extreme atrocity or cruelty" (emphasis added).

As he continued with his instructions, the judge repeatedly stressed that the Commonwealth has the burden of proving beyond a reasonable doubt each element of the crimes as to which the judge instructed. The judge reiterated the correct burden at the end of the charge, stating: "As I told you, the Commonwealth has the duty of proving each element beyond a reasonable doubt." At the conclusion of all the instructions, the judge asked counsel if they were content with the charge. Neither party pointed out the erroneous instructions.

"Because the defendant did not object to the judge's instruction, 'the applicable standard is whether, on review of the entire record, as considered in light of the verdict returned by the jury, a substantial likelihood exists that a miscarriage of justice has occurred.' " *Commonwealth* v. *Grant,* 418 Mass. 76, 84-85

(1994), and cases cited. The transcript reflects that the trial judge misstated the burden of proof by substituting "the defendant" for "the Commonwealth" in three instances and by omitting the word "not" before the word "guilty." However, "[w]hen reviewing jury instructions, '[w]e evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words.' " *Commonwealth* v. *Young*, 461 Mass. 198, 207 (2012), quoting *Commonwealth* v. *Trapp*, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). "We do not consider bits and pieces of the instruction in isolation." *Commonwealth* v. *Young, supra*, citing *Commonwealth* v. *Glacken*, 451 Mass. 163, 168-169 (2008). See *Commonwealth* v. *Grant*, 418 Mass. at 85, quoting *Commonwealth* v. *Cundriff*, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). Apart from these four misstatements, the judge repeatedly stated the correct burden of proof for murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, and for every other crime on which the judge instructed throughout the forty-eight page jury charge. "The judge's misstatement[s] contradicted not only the general theme of [his] instructions but also [were] inconsistent with the specific portions of [his] instructions which immediately preceded and succeeded" the challenged errors. *Commonwealth* v. *Grant, supra.* Because a reasonable juror could not have misunderstood or have been misled by these slips of tongue, we conclude that the errors in the jury instructions did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Young, supra* at 208; *Commonwealth* v. *Grant, supra*, and cases cited.

4. *G. L. c. 278, § 33E.* Finally, the defendant contends that this court should exercise its power under § 33E to order a new trial. After thoroughly reviewing the record in this case in accordance with our duty under § 33E, we have come to the conclusion that there was insufficient evidence from which the jury could have found the defendant guilty of murder in the first degree on the theory of felony-murder with armed robbery as the predicate felony.[12] The record contains no evidence that the defendant was robbing or attempting to rob the victim (or anyone else) at the time of the shooting; the only evidence that touches

---

[12]The defendant did not raise this point on appeal.

on the subject at all is Cripps's statement that when, sometime before the shooting, the defendant asked her what the men in the other apartment were doing, she believed "that he wanted to rip them off." Cripps's largely unexplained belief about the defendant's state of mind sometime earlier in the evening — testimony that was objectionable although not objected to — does not provide an acceptable basis to support a conviction of felony-murder in the first degree based on armed robbery. Nevertheless, because the evidence was more than sufficient to support the jury's conclusion that the defendant killed the victim with deliberate premeditation and extreme atrocity or cruelty, the verdict of murder in the first degree on those theories need not be disturbed. See *Commonwealth* v. *Nolin*, 448 Mass. 207, 220 (2007), citing *Commonwealth* v. *Chipman*, 418 Mass. 262, 270 n.5 (1994) ("If a jury return a guilty verdict based on two theories [of murder in the first degree], the verdict will remain undisturbed even if only one theory is sustained on appeal"). See also *Commonwealth* v. *Barbosa*, 463 Mass. 116, 135 (2012), citing *Commonwealth* v. *Chipman*, *supra* (where jury also convicted defendant of murder in first degree on theory of deliberate premeditation, court need not address sufficiency of evidence supporting conviction on theory of extreme atrocity or cruelty); *Commonwealth* v. *Smith*, 459 Mass. 538, 548 (2011), citing *Commonwealth* v. *Nolin*, *supra* (where jury also convicted defendant of murder in first degree on theory of felony-murder, no need for court to address propriety of conviction on theory of deliberate premeditation). We thus find no grounds on which to exercise our extraordinary authority under § 33E to grant relief to the defendant.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*