NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11448


COMMONWEALTH  vs.  ELVIN VALENTIN.



Bristol.     January 12, 2016. - May 20, 2016.

Present:  Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


Homicide.  Intoxication.  Evidence, Prior misconduct, Relevancy
    and materiality.  Practice, Criminal, Capital case,
    Argument by prosecutor, Request for jury instructions,
    Instructions to jury.



Indictments found and returned in the Superior Court
Department on September 28, 2009.

The cases were tried before Thomas F. McGuire, Jr., J.


John F. Palmer for the defendant.
Rachel W. van Deuren, Assistant District Attorney, for the
Commonwealth.


DUFFLY, J.  The defendant was convicted by a Superior Court

jury of murder in the first degree in the shooting deaths of

Nettie Becht and Luis Diaz, on theories of premeditation and

extreme atrocity or cruelty.  On appeal, the defendant asserts

error in the judge's decision to permit the introduction in

evidence of weapons and related items that he lawfully owned and that were not alleged to have been used in the shooting. The defendant asserts error also in the denial of his request that the jury be instructed on voluntary manslaughter based on a theory of reasonable provocation, and in the instruction that was given that the jury must "find" the defendant was intoxicated. He also challenges portions of the prosecutor's closing argument in several respects.

Concluding that there was no error, we affirm the defendant's convictions and decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or reduce the verdicts to a lesser degree of guilt.

1. Background. a. Commonwealth's case. We recite the facts the jury could have found, reserving certain facts for later discussion. The defendant and Becht lived in different apartments in the same housing complex in New Bedford. They had been involved in an intermittent relationship that spanned a four-year period; during that period, the defendant and Becht occasionally spent the night at each other's apartments and the defendant had loaned Becht money. According to the defendant, Becht had "cheated" on him and he felt that she was "using" him. Becht ended the relationship prior to the shootings.

Becht was treated at a hospital on the night before she was

killed.[1] When the defendant attempted to visit her there, she told him that she did not want to see him. The next day, August 14, 2009, at approximately 8 P.M., the defendant went to the home of a friend of Becht, after Becht failed to return the numerous telephone calls he had made throughout the day. Becht came out of the house and spoke with the defendant while they were standing outside the house. She told him that she had started a relationship with someone else and that she was "done" with him. The defendant responded by saying, "[W]e'll see, we'll see," and told her not to do it "in [his] face." He left and returned to his apartment.

Later that night, at approximately 10 P.M., Becht's friend drove her to a bus station to pick up Luis Diaz, a man Becht had met on a "chat line."[2] Becht had spoken with Diaz on the telephone, but the two had not met in person. After picking Diaz up from the bus station, the friend drove Diaz and Becht to Becht's apartment and left. At that time, the defendant was in his apartment in the same apartment complex, sitting in his kitchen with the lights turned off. He saw Becht and Diaz from

---

[1] The reason for the hospitalization was unrelated to the events leading to her death, and the judge excluded it from evidence.

[2] A witness described the "chat line" as a telephone chat line. A chat line makes it possible for multiple people to communicate with one another at the same time by telephone call, and is often used as an alternative to online dating. See Evenstad v. Carlson, 470 F.3d 777, 780 (8th Cir. 2006).

his window as they walked toward her apartment.  He armed himself with a loaded nine millimeter semiautomatic pistol, which he subsequently told police that he kept readily accessible for protection because he recently had been the victim of a robbery.

The defendant emerged from his apartment carrying the loaded gun.  Becht saw that the defendant was armed and screamed, "No, no."  The defendant first pointed the gun at Diaz and fired; he then pointed the gun at Becht and fired several more shots.  When Diaz tried to get up after he had been shot, the defendant said, "What?  You not ready to die yet?" and again fired the gun at Diaz.  In all, the defendant fired ten shots.  Police and paramedics arrived within minutes of the shootings; Diaz was still breathing but Becht was not.  Both victims were taken by ambulance to a nearby hospital where, later that night, they were pronounced dead.  Each died of gunshot wounds to the torso.

The defendant returned to his apartment and changed his clothes and shoes.[3]  He put the gun in a closet in the living room and left the apartment.  Immediately after the shootings, the defendant spoke to his son on his cellular telephone, and

---

[3] Testing of deoxyribonucleic acid samples taken from the defendant's shoes recovered from his apartment, the gun used to shoot the victims, and the doorknob on his apartment door established that Becht's blood was on each item.

said, "Hey, I killed Netti because I find her with another guy and I killed that other guy, too." Shortly thereafter, a police officer noticed the defendant walking away from the crowd of people that had gathered. The officer followed the defendant, who was still talking on his cellular telephone, and ordered him to stop. When the officer approached, the defendant said, "Yes, yes. I'm the one who did it." The officer read the defendant his Miranda rights, in English, and handcuffed him.[4] The defendant indicated that he understood his rights. Before the officer had asked any questions, the defendant asked, "Is the lady dead?" When the officer responded that he did not know, the defendant asked, "How about the guy? Is he dead?" The defendant's tone was "casual" and without emotion.[5]

As the officer spoke to the defendant, the crowd of people that had gathered at the scene of the shootings began angrily to approach the defendant. The officer placed the defendant in his police cruiser for the defendant's safety. As they sat in the cruiser, the defendant told the officer that he was concerned the crowd would burn his automobile. When the officer asked why he had that concern, the defendant replied that it was because

---

[4] The officer asked the defendant whether he spoke and understood English, and the defendant said that he did. The defendant also indicated that he spoke Spanish.

[5] Prior to trial, the defendant filed a motion to suppress his various statements to police. The motion was denied, and, on appeal, the defendant does not challenge that denial.

he had shot the victims.  The officer asked the defendant why he had done so, and the defendant responded that he had told Becht not to cheat on him.  The defendant told another officer that the gun used in the shootings was located in his apartment.[6]

Police transported the defendant to the police station, where he agreed to be interviewed.  In a video-recorded interview, conducted in English, the defendant explained that he had been in a relationship with Becht for about four years, but that she wanted to date other people.[7]  The defendant stated that he had been sitting in his kitchen with the lights turned off, drinking whiskey, as he waited for Becht to return to her apartment.  He said that he had consumed one-half of a bottle of whiskey in the hours before the shootings, and went "crazy" when he saw Becht walk by his apartment with Diaz because he had been drinking.[8]  When asked whether he had made the decision to shoot

---

[6] The gun was found in a closet in the defendant's living room.

[7] Prior to this interview, an off-duty bilingual officer read the defendant his Miranda rights, this time in Spanish. The defendant stated that he did not want to speak to the officers and that he wanted an attorney.  Then, unprompted, the defendant told the officer that, earlier that night, he had sought out Becht at her friend's house to ask about the status of their relationship, and Becht had said that it was over between them and that she was seeing someone else.  The defendant told the officer that he had said to Becht, "We'll see about that."  He also said that he had consumed three to four glasses of whiskey as he waited for Becht to return home.

[8] A half-empty bottle of whiskey was found in the

Becht and Diaz when he walked out of the apartment with his gun, the defendant said, "Well, yeah, I think that the alcohol made me do the shooting."

b. Defendant's case. The primary defense at trial was that the defendant's intoxication warranted convictions of a lesser offense than murder in the first degree. The defendant called a forensic psychiatrist as an expert witness to explain generally the effects of alcohol intoxication.[9] In addition, one police officer testified that he smelled the odor of alcohol emanating from the defendant as they sat in the police cruiser immediately after the defendant was arrested.

2. Discussion. a. Admission of evidence of other weapons. The defendant argues that he was prejudiced by the Commonwealth's improper introduction of evidence concerning his ownership of weapons other than the weapon used in the shootings, which the defendant categorizes as evidence of prior bad acts. The Commonwealth introduced testimony that the defendant owned several handguns, a rifle, a shotgun, several boxes of ammunition, gun magazines, a National Rifle Association certificate, and a buck knife. Photographs of these items were introduced in evidence, as were the boxes of ammunition and

defendant's apartment.

[9] The expert had not reviewed any of the evidence in the case and had not spoken with the defendant.

other items themselves.  The defendant did not object to the introduction of the testimony or this evidence.  On cross-examination, the defendant elicited testimony establishing that he had been required to satisfy specific criteria to obtain licenses for the firearms.  The prosecutor also referred to some of the weapons evidence in the opening statement.[10]  Because the defendant did not object, we review his claim to determine whether the evidence should not have been admitted and, if it was admitted erroneously, whether the admission created a substantial likelihood of a miscarriage of justice.

We have cautioned against the admission of evidence of weapons or firearms where those items "definitively could not have been used in the commission of the crime" charged.  Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012).  We have expressed concern in such circumstances that the introduction of evidence of firearms unrelated to the crime charged "creates a risk that the jury will use the evidence impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged."  Commonwealth v. McGee, 467 Mass. 141, 156 (2014).  We also have recognized, however, that there may be a

---

[10] The prosecutor told the jury, "You will hear the choices that the defendant made over that evening.  First, he had the choice of which gun he was going to use.  He had a .357, he had a .45 caliber, he had a .40 caliber; all handguns.  He had a .12 gauge shotgun, and he had a Colt 223 rifle.  However, this defendant chose his Smith & Wesson, a nine millimeter, loaded with ten rounds in the magazine."

permissible purpose for the admission of such weapons-related evidence, and have "not unconditionally disapproved" of it. Commonwealth v. Barbosa, supra at 122-123, and cases cited. The critical questions are whether the weapons-related evidence is relevant and, if so, whether the probative value of the evidence is substantially outweighed by its prejudicial effect. See Commonwealth v. McGee, supra.

Here, it is undisputed that none of the weapons-related evidence that the defendant challenges was relevant to the crimes charged. The defendant kept the gun used in the shootings loaded and accessible, apparently not locked in his gun safe. The police recovered that gun from a closet in the defendant's living room; the defendant has not challenged its admission, nor has he challenged the introduction of a box of ammunition from which ten bullets apparently had been used to load the gun used in the shootings. That box of ammunition and the other weapons and ammunition were found locked in a gun safe in the defendant's bedroom.

The Commonwealth contends that the weapons evidence properly was admitted to show that the shootings were premeditated. In the circumstances here, we do not agree. Unlike the scenario presented in Commonwealth v. Tassinari, 466 Mass. 340, 352-353 (2013), there was no evidence in this case that the defendant "deliberately chose" the murder weapon from a

cache of other available weapons, and there was no evidence that, on the night of the shootings, the defendant even unlocked the safe where the other weapons were stored.  Further, the Commonwealth's theory at trial was that the defendant decided to kill Becht because she had told him earlier that day, as well as the night before, that she no longer wanted to be involved in a relationship with him.  There is no suggestion that the defendant acquired or handled any of his other weapons at some point after Becht rebuffed him.  The fact that the defendant lawfully owned multiple firearms and a buck knife, which he kept securely locked in a gun safe, bears no relevance to whether he deliberated before he shot Becht and Diaz.  Contrast Commonwealth v. Carney, 472 Mass. 252, 256 (2015) (evidence defendant owned and was familiar with firearms relevant to show shooting was not accident as defendant claimed).

Likewise, we conclude that the weapons evidence is not relevant to the question whether the murder was committed with extreme atrocity or cruelty.  In total, the defendant fired ten shots at the two victims, and both died of multiple gunshot wounds.  The Commonwealth contends that the weapons evidence permitted the jury reasonably to infer that the defendant was familiar with weapons, and that, based on that inference, the jury could draw the further inference that the disproportionate means the defendant used to inflict death was not the result of

an unskilled shooter, but rather the result intended by an experienced shooter. Such a "piling of inference upon inference" is improper in this context. Cf. Commonwealth v. Kelly, 470 Mass. 682, 693 (2015). The defendant made no claim at trial that the multiple bullets fired, or the shootings themselves, were the result of a lack of familiarity with guns or ignorance regarding the damage multiple gunshots could inflict. Nothing about the defendant's skill level as a shooter or familiarity with guns was related to any of the issues at trial. Cf. Commonwealth v. Anderson, 448 Mass. 548, 560 (2007) (testimony that defendant was skilled with knife "tended to prove that [he] possessed the means and ability to commit the crime, thus making it relevant to whether he was the killer"). Because the evidence of the defendant's lawful ownership of other firearms, ammunition, and a buck knife was not relevant to the jury's determination whether the shootings were committed with extreme atrocity or cruelty, the evidence should not have been admitted.

Even if we were to agree, as the Commonwealth argues, that it had some "tenuous relevancy" to show that the defendant "was acquainted with weapons and was able to use them," that probative value is substantially outweighed by its prejudicial effect. See Commonwealth v. Toro, 395 Mass. 354, 358 (1985). The Commonwealth contends also that because the defendant

lawfully owned the weapons and ammunition, he cannot argue that evidence of his ownership was prejudicial "bad act" evidence. The rules of evidence, however, do not contemplate only the exclusion of evidence relating to unlawful acts.  A trial judge "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." See Mass. G. Evid. § 403 (2016).  In addition, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  See Mass. G. Evid. § 404(b)(1) (2016).

Accordingly, our focus is on whether the weapons evidence "creates a risk that the jury will use the evidence impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged."  See Commonwealth v. McGee, supra at 156.  As the defendant argues, the evidence of his ownership of multiple firearms portrayed him as someone who was likely to commit murder, the crime with which he was charged, and should not have been admitted.

The improperly admitted evidence, however, did not create a substantial likelihood of a miscarriage of justice.  The evidence against the defendant was strong.  There was a vast quantity of evidence that he was the shooter and shot both victims with the firearm recovered by police, and no evidence to

the contrary.  There were several witnesses to the shootings and, immediately after the shootings, the defendant confessed and explained his motive to police.  In this context, the evidence of the defendant's other weapons would have been "insignificant" in the jury's thinking.  See Commonwealth v. Toro, supra at 359.  Although the judge did not provide a limiting instruction on the use of the unrelated weapons evidence, defense counsel effectively cross-examined the police witness who testified about the other weapons in order to establish that the defendant lawfully owned them, and thus that he had satisfied the required criteria for a firearms license, and that the other weapons had not been used in the crime charged.  This mitigated some of the danger that the jury would draw a prejudicial inference from the evidence.  In sum, the jury's verdicts would not have been different had the improperly admitted weapons evidence been excluded.

b.  Prosecutor's closing argument.  The defendant asserts that several aspects of the prosecutor's closing argument were improper.  He claims that the prosecutor suggested, without evidentiary basis, that the defendant was "lying in wait" for Becht to return on the night of the shootings, and that she was "begging" for her life as the shots were being fired.  The defendant also contends that the prosecutor injected her own view of the witnesses' credibility into her closing, and

improperly asked the jury to put themselves in the place of the defendant. Because the defendant did not object to any portion of the closing argument at trial, we review to determine whether the improprieties, if any, posed a substantial likelihood of a miscarriage of justice. See Commonwealth v. Mejia, 463 Mass. 243, 253-254 (2012). We discern no error.

"Prosecutors must limit the scope of their closing arguments to facts in evidence and the fair inferences that may be drawn therefrom." Commonwealth v. Guy, 441 Mass. 96, 110 (2004). Here, there was evidence that the defendant was in his apartment, sitting in the dark, waiting for Becht to come home, and that he had a loaded gun nearby. The prosecutor's statement that the defendant was "lying in wait" and other similar remarks were fair arguments grounded in the evidence, and were related to the issue of premeditation. There also was testimony that Becht yelled, "No, no," as the defendant shot at her. The prosecutor's argument that Becht was "begging for her life" was not improper in light of this evidence, and was relevant to the Commonwealth's theory of extreme atrocity or cruelty. See Commonwealth v. Taylor, 455 Mass. 372, 383 (2009), quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987) ("A prosecutor may argue 'forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence").

The defendant also contends that the prosecutor improperly

injected her own view of the witnesses' credibility into her closing in discussing the issue of intoxication. In reviewing this claim, we consider the context in which the prosecutor made her remarks. At trial, defense counsel elicited testimony from a police officer that the police had found a half-empty bottle of whiskey in the defendant's apartment. In his closing argument, defense counsel drew attention to the presence of the whiskey bottle, stating, "As a matter of fact, when [the detective] testified, and [the prosecutor] was introducing a number of items, you didn't see him pick up that bottle and introduce it. I did. I did. They want this [half-empty bottle of whiskey] to be nonexistent. It's not. It exists. And you can't disregard it."

The prosecutor began her closing argument by responding to defense counsel's argument. She stated:

> "Defense counsel made mention [of] the fact that he had to put [the half-empty whiskey bottle] into evidence through [the detective]. Well, do you remember the testimony of [the detective]? He wasn't the one who found it. Why would it go in through him? [A State police trooper] was the person who found the alcohol, who hadn't testified yet. So is that what you think, ladies and gentlemen? That [we] have been trying to keep things from you during the course of this trial? We've put well over a hundred exhibits before you. I'm not asking you to ignore the alcohol at all."

This argument was not improper, but, rather, was in direct response to the defendant's suggestion that the Commonwealth sought to hide evidence that a partially consumed bottle of

whiskey had been recovered from the defendant's home.  See Commonwealth v. Lewis, 465 Mass. 119, 130 (2013) ("prosecutor may address a particular point in defense counsel's closing argument").

Likewise, the prosecutor's final statement to the jury "ask[ing]" them, "on [her] behalf, and on the behalf of [her co-prosecutor], and on behalf of the Commonwealth, that [they] find this defendant . . . guilty of . . . murder in the first degree" was not improper.  The phrase was a "rhetorical flourish" that the prosecutor used to argue that the jury should render guilty verdicts.  "[W]e presume the jury 'know that the prosecutor is an advocate' . . . and that they recognize arguments as 'advocacy and not statements of personal belief'" (citations omitted).  See Commonwealth v. Mejia, supra at 254.

The defendant's final contention is that "the prosecutor improperly urged the jurors to rely on their own experiences with intoxication, instead of the evidence, in evaluating the . . . intoxication defense."  The prosecutor stated,

> "Use your common sense and life experience. . . . Certainly you guys over your various years have seen people intoxicated, might have been intoxicated yourself.  You know what the reaction is.  You know what outward signs you might have had.  Would you have the capability to do this?  To walk up calmly, confidently, deliberately, put up a gun, hold your hand straight, shoot ten times?"

Inviting the jurors to draw upon their own life experience and common sense is permissible.  See Commonwealth v. Lao, 460 Mass.

12, 22 (2011) ("request that jury apply their common sense was proper"). Although the suggestion that the jury put themselves in the place of the defendant would have been better not made, here the statement was made in the context of asking the jurors to consider their own life experiences and common sense in evaluating the effect of intoxication. Cf. Commonwealth v. Pontes, 402 Mass. 311, 318 (1988) (asking jury to put themselves in place of victim's father not improper where, in context, it was attempt to suggest father acted reasonably). Contrast Commonwealth v. Bizanowicz, 459 Mass. 400, 420 (2011) ("jury should not be asked to put themselves 'in the shoes' of the victim, or otherwise be asked to identify with the victim"). There was no error in the prosecutor's closing argument.

c. Jury instruction on voluntary manslaughter. At the close of all the evidence, the defendant orally requested an instruction on voluntary manslaughter based on the theory that the defendant killed the victims in the heat of passion because he was reasonably provoked when he saw Becht with Diaz on the night of the shooting. Concluding that the evidence did not warrant a finding of reasonable provocation, the judge denied the request and the defendant objected.

The defendant contends that the judge should have instructed the jury on voluntary manslaughter because the defendant still considered Becht to be his "girl friend" at the

time of the shootings.  The defendant acknowledges that Becht had told him that their relationship was over and that she was dating other people, but points to his statement that he had warned her "[not to] do it in [his] face."  The defendant maintains that he went "crazy" when he saw Becht walking with Diaz, and thus that the instruction was warranted.

Where an instruction on voluntary manslaughter is requested, a trial judge should so instruct the jury if any view of the evidence would warrant a finding that the unlawful killing arose not from malice, but "from . . . sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense."  See Commonwealth v. Avecedo, 446 Mass. 435, 443 (2006), quoting Commonwealth v. Carrion, 407 Mass. 263, 267 (1990).  Reasonable provocation means that a reasonable person would have been provoked "to lose his self-control in the heat of passion," and that person would not have had time to "cool off" before the killing (citations omitted).  See Commonwealth v. Avecedo, supra at 442-443.  Because the standard is both objective and subjective, the jury must be able to infer from the evidence not only that a reasonable person would have been so provoked, but also that the defendant was in fact provoked and that he or she did not have sufficient time to cool off in the period that elapsed between the provocation and the homicide.  See id. at 443; Commonwealth v. Groome, 435 Mass.

201, 220 (2001). We "view the evidence in the light most favorable to the defendant to determine whether an instruction on reasonable provocation was warranted." Commonwealth v. Avecedo, supra.

Here, the evidence introduced at trial would not have permitted the jury to find reasonable provocation. Even assuming that the defendant still believed that Becht was his girl friend on the day of the shootings, the facts do not support a finding of reasonable provocation as defined in our case law. Viewed in the light most favorable to the defendant, he and Becht had been involved in an occasional romantic relationship, which Becht had ended several hours prior to the shootings. Moreover, on the night before the shootings, Becht had rebuffed the defendant when he tried to visit her at the hospital. The defendant thus had no reason to expect that Becht would not become romantically involved with other people, and has no basis upon which to claim that he was reasonably provoked when he saw Becht with Diaz. See Commonwealth v. Benson, 453 Mass. 90, 95 (2009) ("provocation occurs only when an action of the victim triggers a sudden loss of self-control in the defendant"). Contrast Commonwealth v. Andrade, 422 Mass. 236, 238 (1996) (evidence supported inference that defendant observed spouse with another man, thus confirming his suspicion of unfaithfulness).

Even were we to assume that the defendant reasonably could have expected fidelity from Becht, the evidence would not have permitted the jury to find that the defendant was reasonably provoked.  The defendant did not come upon Becht and Diaz engaged in romantic or sexual activity; he observed them merely walking together towards her apartment.  Compare Commonwealth v. Smith, 460 Mass. 318, 325 (2011) (defendant discovered victim, whom he had been dating for six weeks, engaging in oral sex with another man).  On these facts, the jury could not infer that a reasonable person would have become sufficiently provoked to shoot and kill two people.  See Commonwealth v. Benson, supra.  There was no error in the denial of the defendant's request for a manslaughter instruction.

d.  Jury instruction on intoxication.  In her final charge, the judge properly instructed the jury on intoxication, and the defendant does not challenge that instruction.  After a few hours of deliberation, the jury submitted a note with a question concerning the "subcategories" of murder.  After a sidebar discussion, neither the judge nor counsel were able to determine precisely what information the jury sought.  With counsel's approval, the judge decided to "go over the instructions again, perhaps in a more summary fashion."

In his summary review of the instructions, after describing the elements of the various degrees and theories of murder, the

judge instructed,

> "Intoxication does not necessarily excuse murder. The question is did the intoxication prevent the defendant from forming the intent or from having knowledge of the circumstances giving rise to the plain and strong likelihood of death. So you can consider any believable evidence -- if you find that the defendant was intoxicated from the consumption of alcohol, you can consider that evidence on several points. . . . And then you can also consider any intoxication, if you find intoxication, on the issue of whether the defendant acted in a cruel or atrocious manner in causing the death of the deceased. . . . So I'll just repeat. . . . So the intoxication bears on, if you find intoxication, you can consider it in evaluating the defendant's intention and the defendant's knowledge of the circumstances"

In total, the judge stated three times that if the jury found the defendant was intoxicated, they could consider his intoxication when evaluating both theories of murder in the first degree.

The defendant argues that the instruction that the jury had to "find" intoxication improperly shifted the burden of proof from the Commonwealth to him. Because the defendant did not object at trial, we review to determine whether there was a substantial likelihood of a miscarriage of justice. Although we have observed that this "finding" language is disfavored in a jury instruction, it "is not in error when the charge, read as a whole, clearly places the burden on the Commonwealth to prove each element of the offense beyond a reasonable doubt." Commonwealth v. Petetabella, 459 Mass. 177, 192 (2011), citing

<u>Commonwealth</u> v. <u>Cundriff</u>, 382 Mass. 137, 153 (1980), cert. denied, 451 U.S. 973 (1981). Moreover, our concern with the "finding" language is most acute when used in conjunction with "complete, malice-negating defenses," such as self-defense, accident, or necessity. See <u>Commonwealth</u> v. <u>Waite</u>, 422 Mass. 792, 805 (1996), and cases cited. Because "intoxication and impairment do not negate premeditation, but are mere subsidiary facts that the jury consider in sifting the circumstantial evidence as to [the defendant's] mental state . . . , there is no particular standard of proof that 'finding' language can impermissibly alter."[11] <u>Id</u>. at 805-806.

Here, as the defendant concedes, the instructions provided to the jury before they began deliberating were proper. Although the judge used the disfavored "finding" language in his summary reiteration of the instructions, the use of this language did not shift the burden of proof to the defendant. When viewed as a whole, the instructions clearly placed the burden of proof on the Commonwealth to prove each element of

---

[11] We decline the defendant's invitation to reconsider our line of cases distinguishing "subsidiary facts" from facts that bear on "malice-negating offense" based on the United States Supreme Court's decision in <u>Alleyne</u> v. <u>United States</u>, 133 S. Ct. 2151 (2013). There, the Court held that any fact that increases a mandatory minimum sentence is an element of the crime, not merely a sentencing factor, and therefore a criminal defendant has a right under the Sixth Amendment to the United States Constitution to have the jury decide all such facts. <u>Id</u>. at 2162-2163. Those Sixth Amendment concerns are not implicated here.

murder, including intent, beyond a reasonable doubt.

e. <u>Review under G. L. c. 278, § 33E</u>.  We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and conclude that there is no reason to order a new trial or to reduce the degree of guilt.

<u>Judgments affirmed</u>.