BUDD, J.
**498 Following a jury trial, the defendant, Jose I. Collazo, was convicted of murder in the first degree on a theory of deliberate premeditation, in connection with the shooting death of Jose Fuentes, and of carrying a firearm without a license in violation **499 of G. L. c. 269, § 10 (a ).[1] On appeal, the defendant argues evidentiary errors as well as improper argument during the prosecutor's closing, all of which he claims require a reversal of his convictions. Alternatively, the defendant requests that we exercise our authority under G. L. c. 278, § 33E, to reduce the verdict of murder in the first degree because the evidence is insufficient to establish deliberate premeditation. Upon full review of the record, we affirm and decline to reduce his murder conviction under § 33E.
Background. We summarize the facts as the jury could have found them, reserving certain details for discussion infra. On February 13, 2009, the defendant's former girlfriend, Sandra Fajardo, ended her dating relationship with the defendant and immediately started dating the victim. On the evening of February 20, 2009, the victim, *1206 Fajardo, Fajardo's two young children, and Fajardo's friend Jenny Albizu were at the apartment that Fajardo and the defendant recently had rented. Sometime after midnight, Fajardo, the victim, and Albizu heard someone knocking on the back door and the windows of the basement apartment. Fajardo told the victim not to go outside to see who was knocking because she thought it was the defendant.
Early the following morning, the defendant telephoned his friend, Jamie Fekeris, to ask what kind of automobile the victim drove. After Fekeris provided the defendant with this information, the defendant stated, "I'm going to get that fucker." Between approximately 8 A.M. and 8:30 A.M. , the defendant asked the landlord to help him access the apartment, telling the landlord that Fajardo was out of town. The landlord, who had rented the apartment to both Fajardo and the defendant days before, gave the defendant access to the basement and provided him with a butter knife to force open the lock on the door to the apartment.
The defendant entered the apartment, greeted Albizu, and proceeded to walk to the bedroom where Fajardo, her two children, and the victim were sleeping. Witnesses heard gunshots and screaming. First responders found the victim lying on the bed in a pool of blood. An autopsy revealed that the victim suffered four gunshot wounds and blunt trauma to the head.
Approximately ten to twenty minutes after his first telephone call to Fekeris, the defendant called Fekeris again and told him, "I just merked him." Fekeris understood the term "merk" to mean **500 "kill." The defendant went to Alyssa Hooper and Samantha Witham's apartment, which was located nearby. While there, the defendant appeared upset and agitated. He asked Hooper if she had any bleach that he could use to wash his hands because he thought there was blood on them. The defendant washed his hands and told Hooper and Witham that he would pay them to drive him to New York. During the drive to New York, the defendant told Hooper and Witham that he killed the victim. On March 4, 2009, the defendant surrendered to New York City police after learning that there was a warrant for his arrest. During questioning with Massachusetts State police, the defendant claimed to have been in New York City at the time the victim was killed.
At trial, the defendant mounted a heat of passion defense, conceding that he beat and shot the victim, but only did so because he "went crazy" when he saw Fajardo in bed with another man.
Discussion. 1. Defendant's statement to police. A detective from the Haverhill police department and a trooper from the Massachusetts State police traveled to New York City to question the defendant, who had surrendered to local authorities weeks after the killing. During the recorded interview, the defendant was asked when he was last in Massachusetts. He responded that he left for New York prior to Valentine's Day and had not been back to the Commonwealth since then. When questioned about whether he was in Haverhill on the day of the killing, he denied it. On appeal, the defendant argues that the denials undermined his sudden provocation defense and that admitting a recording of the interview created a substantial likelihood of a miscarriage of justice because it contained unequivocal denials of accusations of a crime.[2] This argument lacks merit.
It is true that if a defendant is accused of a crime and unequivocally denies *1207 it, the denial is not admissible at trial. See Commonwealth v. Santana, 477 Mass. 610, 621, 82 N.E.3d 986 (2017). The rationale for the rule is that "[e]xtrajudicial accusatory statements made in the presence of a defendant, which he [or she] has unequivocally denied, are hearsay and inadmissible as evidence of guilt in the Commonwealth's case-in-chief" (footnotes omitted). Commonwealth v. Womack, 457 Mass. 268, 272, 929 N.E.2d 943 (2010). That is not the case here. The statement the defendant sought to suppress was neither a response to an accusation of a crime nor an unequivocal **501 denials. See Commonwealth v. Cruzado, 480 Mass. 275, 278, 103 N.E.3d 732 (2018). Instead, the defendant made self-serving and demonstrably false statements that were admissible to show his consciousness of guilt. See Commonwealth v. Martinez, 476 Mass. 186, 197, 65 N.E.3d 1185 (2017). There was no error.
2. Admission of firearm evidence. At trial, the Commonwealth offered evidence of a .25 caliber semiautomatic pistol and two boxes of ammunition recovered from a closet in Fajardo's apartment, along with testimony that these items belonged to the defendant. On appeal, the defendant argues that this evidence was admitted erroneously because it "depicted [him] as a violent, lawless individual" and it lacked any probative value as it did not match the weapon used in the commission of the crime.[3] Because defense counsel withdrew his initial objection to the admission of this evidence, our review is for a substantial likelihood of a miscarriage of justice.[4] See Commonwealth v. Barbosa, 457 Mass. 773, 792, 933 N.E.2d 93 (2010), cert. denied, 563 U.S. 990, 131 S.Ct. 2441, 179 L.Ed.2d 1214 (2011).
Relying on Commonwealth v. Tassinari, 466 Mass. 340, 352-353, 995 N.E.2d 42 (2013), the Commonwealth asserts that the evidence was properly admitted because it "was relevant to the Commonwealth's theory of premeditation." Id. at 353, 995 N.E.2d 42. We disagree. In Tassinari, evidence of the defendant's firearms was relevant to the theory of premeditation because the Commonwealth asserted that the defendant deliberately selected particular guns from his firearm collection to shoot the victim. Id. Here, the second firearm and ammunition recovered from Fajardo's apartment was not used in the shooting, nor was there a possibility that it could have been used under either the Commonwealth's or the defendant's theory of the case. "Where a weapon definitively could not have been used in the commission of the crime, we have generally cautioned against admission of evidence related to it" (citation omitted). Commonwealth v. Imbert, 479 Mass. 575, 585, 97 N.E.3d 335 (2018). See Commonwealth v. Valentin, 474 Mass. 301, 306, 50 N.E.3d 172 (2016) ("The critical questions are whether the **502 weapons-related evidence is relevant and, if so, whether the probative value of the evidence is substantially outweighed by its prejudicial effect").
Because the victim was not shot with the firearm found in the apartment, and there *1208 was no evidence presented that the defendant even tried to access the second firearm before he shot the victim, the fact that the defendant may have owned a second firearm and ammunition "bears no relevance to whether he deliberated before he shot [the victim]." Valentin, 474 Mass. at 306-307, 50 N.E.3d 172. It was therefore error to admit it.
Although this extraneous firearm evidence created a risk that the jury would impermissibly infer that the defendant has a bad character or a propensity to commit the crime charged, see Commonwealth v. McGee, 467 Mass. 141, 156, 4 N.E.3d 256 (2014), there was no substantial risk of a miscarriage of justice. The jury heard ample evidence that the defendant committed premeditated murder, including the testimony from Fekeris that the defendant telephoned him to ask what type of automobile the victim drove and said, "I'm going to get that fucker," referring to the victim, and that the defendant telephoned Fekeris again approximately twenty minutes later and told him that he had "just merked" the victim.
In light of the evidence establishing that the defendant entered the apartment intending to shoot the victim, we are substantially confident that the evidence of a second firearm and ammunition did not alter the jury's verdicts. See Commonwealth v. Vazquez, 478 Mass. 443, 451, 85 N.E.3d 973 (2017), citing Commonwealth v. Montrond, 477 Mass. 127, 135-136, 75 N.E.3d 9 (2017). There was no substantial likelihood of a miscarriage of justice. See Valentin, 474 Mass. at 308, 50 N.E.3d 172 (although unrelated weapons evidence was admitted improperly, there was no substantial likelihood of miscarriage of justice because jury heard "a vast quantity of evidence" that defendant committed crime, including "defendant's confess[ion] and expla[nation of] his motive to police").
3. Prosecutor's closing argument. The defendant additionally contends that the prosecutor's closing argument impermissibly commented on the defendant's right to remain silent and misstated evidence, resulting in reversible error. Because defense counsel failed to raise these objections at trial, we now "consider whether any of the challenged statements was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice." Commonwealth v. Martinez, 476 Mass. 186, 198, 65 N.E.3d 1185 (2017).
a. Burden shifting. In response to the defendant's argument that he could not be guilty of the indictment charging home invasion **503 because the apartment he entered was his own, the prosecutor suggested during closing argument that the defendant had no belongings in Fajardo's apartment other than the .25 caliber firearm and ammunition found there: "Did you hear about another piece of property of his that was in [the apartment] besides that gun? I suggest you didn't ...." Although there was no objection at trial, the defendant now argues that this rhetorical question and answer was a comment on the defendant's failure to offer evidence in his own defense.
A defendant has the right not only to remain silent, but also "to remain passive, and to insist that the Commonwealth prove its case beyond a reasonable doubt without explanation or denial by him." Commonwealth v. Grant, 418 Mass. 76, 83, 634 N.E.2d 565 (1994), quoting Commonwealth v. Madeiros, 255 Mass. 304, 307, 151 N.E. 297 (1926). "[P]rosecutors should scrupulously avoid any statement that suggests that the defendant has any burden to produce evidence." Commonwealth v. McMahon, 443 Mass. 409, 419, 822 N.E.2d 699 (2005). However, "[a] prosecutor is entitled to emphasize the strong points of the Commonwealth's case *1209 and the weaknesses of the defendant's case, even though he [or she] may, in so doing, prompt some collateral or passing reflection on the fact that the defendant declined to testify." Commonwealth v. Nelson, 468 Mass. 1, 12, 7 N.E.3d 1084 (2014), quoting Commonwealth v. Feroli, 407 Mass. 405, 409, 553 N.E.2d 934 (1990).
Here, the prosecutor attempted to demonstrate the lack of evidence supporting the defendant's claim that he resided in Farjado's apartment. See Commonwealth v. Storey, 378 Mass. 312, 323-324, 391 N.E.2d 898 (1979), cert. denied, 446 U.S. 955, 100 S.Ct. 2924, 64 L.Ed.2d 813 (1980) (rhetorical question highlighting general weakness of defense was not comment on defendant's failure to testify). See also Nelson, 468 Mass. at 13, 7 N.E.3d 1084 (prosecutor's statements were not improper where they attempted to undercut defendant's claim that his wounds were defensive). Although this portion of the prosecutor's closing does not rise to the level of reversible error, we nonetheless urge caution whenever the Commonwealth's comments could be construed as suggesting that the defendant was required to present evidence. See McMahon, 443 Mass. at 419, 822 N.E.2d 699.
b. Characterization of evidence. During closing arguments, the prosecutor also argued that the defendant committed premeditated murder because he was "humiliated in front of his boys" as he waited all night outside of Fajardo's apartment "like a fool," while Fajardo and the victim were inside. The defendant contends **504 that, as part of that theory, the prosecutor unfairly depicted the defendant as something akin to a gang leader, referring to him multiple times as an "Alpha dog" and "leader of the pack" who "became a very significant person in that group of people that hung around there [together] ... in Haverhill."
While prosecutors may not misstate evidence in their closing arguments, Commonwealth v. Joyner, 467 Mass. 176, 188-189, 4 N.E.3d 282 (2014), they are "entitled to argue forcefully for the defendant's conviction based on the evidence" (quotation omitted). Commonwealth v. Lopes, 478 Mass. 593, 606, 91 N.E.3d 1126 (2018), quoting Commonwealth v. Wilson, 427 Mass. 336, 350, 693 N.E.2d 158 (1998). A prosecutor's use of "[e]nthusiatic rhetoric, strong advocacy, and excusable hyperbole" in a closing argument is permissible. Lopes, supra at 606-607, 91 N.E.3d 1126.
The prosecution's depiction of the defendant as the leader of the group was a fair comment on the testimony presented at trial. That testimony demonstrated that the defendant and his group of friends all lived near each other and spent time together almost daily. Further, when the defendant needed something from these friends, they would do what he asked. For example, when the defendant and Farjado were moving into their new apartment, the defendant's friends helped get the apartment ready before the move, painting and wallpapering the apartment, and when the defendant asked Fekeris a week before the murder to drive him to the airport and then to New York at the last minute, Fekeris gave him a ride.
Although the prosecutor's description of the defendant as "leader of the pack" and "Alpha dog" may have been better left unsaid, it did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Siny Van Tran, 460 Mass. 535, 554, 953 N.E.2d 139 (2011) (description of crime as "mass execution" and "[o]ne of the worst and most violent days in the history of Boston" excusable hyperbole); Commonwealth v. Silva, 455 Mass. 503, 515, 918 N.E.2d 65 (2009) ("prosecutor's description of the defendant's gun as *1210 a 'cannon' " was "enthusiastic rhetoric, strong advocacy, and excusable hyperbole" [citation omitted] ).
4. Review under G. L. c. 278, § 33E. Finally, the defendant asks us to exercise our extraordinary power to grant relief under G. L. c. 278, § 33E. We have reviewed the record in its entirety and see no basis to set aside or reduce the verdict of murder in the first **505 degree.[5]
Judgments affirmed.

The defendant was acquitted on an indictment charging home invasion.

Alternatively, the defendant claims that the failure to file a motion to suppress the statements he made during the interrogation was ineffective assistance of counsel.

Spent projectiles recovered from the victim's body and two shell casings and one bullet were recovered from the bedroom were .38 caliber. The firearm and boxes of ammunition recovered from Fajardo's apartment were .25 caliber.

Defense counsel did not provide a basis for either lodging or withdrawing the objection. However, we note that defense counsel argued during closing argument that the defendant could not be convicted of home invasion because he lived in the apartment -- one cannot be found guilty of invading one's own home. See Commonwealth v. Marshall, 65 Mass. App. Ct. 710, 716, 843 N.E.2d 685 (2006) (controlling question with respect to home invasion statute is whose place of habitation it is).

We note that Erik Koester, a former crime scene analyst at the State police crime laboratory, testified for the prosecution at the defendant's trial on June 15, 2010. Koester supervised the team that collected evidence from the crime scene and tested several pieces of the evidence collected for traces of blood.
In 2012, Koester's employer learned that Koester received "unsatisfactory" results on his 2010 crime scene proficiency test as a result of improperly measured blood spatter evidence. See Commonwealth v. Hernandez, 481 Mass. 189, 195, 113 N.E.3d 828 (2019). Although the record does not reveal whether Koester took the proficiency test prior to his testimony in this case, if he did, the test results received after trial would be considered newly available evidence. See Commonwealth v. Grace, 397 Mass. 303, 306, 491 N.E.2d 246 (1986) (newly discovered evidence must have been unknown to defense and not reasonably discoverable at time of trial).
However, the discovery of such evidence requires a new trial only if "there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." Id. Here, Koester's role in the investigation had no impact on the central issue of the case, that is, whether the defendant committed premeditated murder or manslaughter. Thus, even though the evidence could be considered impeachment material, the fact that the defendant did not have the benefit of it did not create a substantial risk of a miscarriage of justice. See Commonwealth v. Sullivan, 478 Mass. 369, 383, 85 N.E.3d 934 (2017), quoting Commonwealth v. Lo, 428 Mass. 45, 53, 696 N.E.2d 935 (1998) (denying motion for new trial based on Koester's performance deficiencies). A new trial is not warranted on this basis.