NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-948                                          Appeals Court

COMMONWEALTH  vs.  MICHAEL AHERN.

No. 17-P-948.

Suffolk.     October 11, 2018. - October 7, 2019.

Present:  Green, C.J., Hanlon, & Maldonado, JJ.


Motor Vehicle, Homicide, Operating under the influence.
     Alcoholic Liquors, Motor vehicle.  Evidence, Intoxication.
     Practice, Criminal, Presumptions and burden of proof,
     Argument by prosecutor, New Trial.



     Indictment found and returned in the Superior Court
Department on November 14, 2012.

     The case was tried before Christopher J. Muse, J., and a
motion for a new trial, filed on March 16, 2017, was heard by
him.


     Dara Z. Kesselheim, Assistant District Attorney (Gregory D.
Henning, Assistant District Attorney, also present) for the
Commonwealth.
     Sean M. Smith for the defendant.


     HANLON, J.  After a jury trial, the defendant, Michael

Ahern, was convicted of motor vehicle homicide while under the

influence of an intoxicating substance, G. L. c. 90, § 24G (a).

After trial, he moved for a new trial, contending that, in closing argument, the prosecutor had shifted the burden of proof to the defense.  The trial judge allowed the motion and the Commonwealth appeals.  We reverse.

1.  Background.  The jury heard the following evidence.  On September 13, 2012, at approximately 4:30 P.M., the defendant and a friend went to a Boston restaurant for drinks and appetizers.  While they were there, the defendant consumed one Amstel Light beer.  At around 5:46 P.M., the defendant and the friend left the restaurant, and the defendant drove her to South Boston.

At approximately 9:48 P.M., the defendant walked into the Slate Bar & Grill (Slate) at 109 High Street in Boston and ordered a glass of champagne.  At just after 10 P.M., Lindsey Smith, the bar manager at Slate, selected a bottle of champagne and brought it to the defendant at a table.[1]  She poured some champagne in a glass for herself and some in a glass for the

---

[1] Smith was acquainted with the defendant, who had been instrumental in helping her obtain the job as bar manager at Slate.  She believed he was one of the owners, along with several other people.  Smith testified that she was permitted to serve certain people, including owners, regulars at the bar, and friends without charging them; she described the process as a "comp tab" and said that, at least a couple of times, the defendant had not paid his tab for that reason.  Smith also identified various surveillance cameras located "[a]ll the way down at the opening of the bar" and "one . . . above the kitchen door."

defendant. Smith drank only some of her glass of champagne because she was working; she testified that she spent about an hour with the defendant, using the time to complain about her general manager. She was emphatic that she had not finished her glass of champagne, or consumed anything else from the bottle.

Videotape footage (video) from the establishment showed the defendant switching the glasses, taking Smith's partially full glass, and drinking what was left in the glass. He then appeared to finish drinking what was in the bottle of champagne by tipping it upwards and emptying its contents. At around 11 $\underline{P}$.$\underline{M}$., Smith went back to the bar area of the restaurant, and the defendant moved from his table to the bar. Smith then opened a second bottle of champagne and poured a glass for the defendant.[2]

Brian Schmidt also testified that he worked at Slate on the night in question. He knew the defendant and believed him to be one of the owners. Schmidt remembered that, earlier in the evening, Smith had received a text from the defendant that he was on the way and so they "kind of notified everybody that one of the owners [was] coming in, don't close the kitchen early, don't start breaking down for the night, you know, leave everything in order." Schmidt testified that the defendant sat

---

[2] Smith also testified that the defendant's vehicle was in the parking lot of the bar when the defendant was present, the same Ford pick-up truck that killed the victim.

with Smith in the dining area for about an hour and then moved to the bar.  At around midnight, Schmidt heard a glass break; he saw that it had happened at the place where the defendant was sitting.  Right afterwards, he heard the door open and saw the defendant leave -- "[n]ot a stroll out the door but just kind of with intent."[3]

Shortly after 12:15 A.M., Boston Police Officer Marilynne Gaffey noticed the defendant's pickup truck stopped on the side of Morrissey Boulevard in the Dorchester section of Boston.  She also saw the victim, Doan Bui, and his bicycle lying in the road.  She stopped, called for backup and medical assistance, and went to help the victim, who was nonresponsive.  He was

---

[3] Schmidt described the defendant's leaving as "an Irish exit.  It's kind of a no goodbye, didn't hear anything from him, just kind of, he was gone, up and left."  In summarizing Schmidt's testimony in his closing argument, the prosecutor repeated the term.  The judge took exception to the use of the term "Irish exit"; he wrote in his decision allowing the defendant's motion for a new trial that "while it may not have been intended, this comment conjures up the worst of stereotypes and is insulting and offensive to many.  Comments on ethnicity have no place in a courtroom.  Even though it originated with a witness, its repetition by the prosecutor was unwarranted and potentially prejudicial."  We agree that ethnic slurs and stereotypes should be avoided in the court room; however, trial lawyers take their witnesses as they find them, and repetition of this particular term cannot be said to be prejudicial here, as it did not relate to the defendant's character, driving, intoxication, or use of alcohol.  Moreover, at oral argument, defense counsel explicitly disclaimed any claim that use of the term was prejudicial here.

dressed in a black hooded sweatshirt. Emergency medical technicians (EMTs) Matthew King and Christopher Mancuso arrived soon after Gaffey and determined that the victim was dead.[4]

The EMTs found the defendant sitting against a fence by the side of Morrissey Boulevard. Both EMTs noticed that the defendant had slurred speech, and King noticed that he had glossy eyes, as if he had been crying. State Police Trooper Gregory Turco spoke with the defendant and testified that the defendant's responses were "unintelligible" because his speech was slurred. Turco testified that, based upon "[t]he odor of alcohol, his inability to look us in the eye when he was speaking with us, his confusion, his confused state, and based on what we saw, our interactions with him, I formed an opinion that, yes, he was intoxicated." Turco's partner, State Police Trooper Richard Lauria, also testified that, in his opinion, the defendant was intoxicated. When he spoke to the troopers, the defendant said that he had "found" the victim and appeared not to understand that there was damage to his truck.

---

[4] The victim's wife testified; she said that her husband was the primary caretaker for their two children. In the summer, he liked to go fishing at night near the gas tank on Morrissey Boulevard. They would have a cookout with the fish and give some of it away. She also testified that her husband frequently rode his bicycle and that he was a good bicyclist -- "he's careful and he knows his way on the road." The last time that she saw her husband alive was in the afternoon, hours before he was killed, as he was preparing to go fishing.

At the defendant's request, the EMTs transported him to Boston Medical Center. During the ride, Mancuso rode with the defendant in the back of the ambulance and noticed the smell of alcohol on his breath. Mancuso, who had been an EMT for twenty years and a bartender for five years, testified specifically that he believed the defendant was intoxicated.

State Police Trooper James DeAngelis followed the ambulance carrying the defendant to the hospital and he testified that he noticed the smell of alcohol when the ambulance doors opened.[5] DeAngelis also testified that the defendant had slurred speech, and that, when the defendant was asked to produce his license at the hospital, "I observed him pass his license once. . . . [He] passed his license again and then on the third attempt . . . he pulled it out." DeAngelis concluded his testimony by saying, "My opinion was that he was drunk."

State Police Detective Thomas Canning, the lead investigator on the case, interviewed the defendant in the hospital. He observed the defendant to have somewhat slurred speech and glassy eyes and noticed an odor of alcohol. He also watched the defendant stagger from his hospital bed to the bathroom. Based upon all of his observations, Canning concluded

---

[5] DeAngelis testified, "I immediately detected a fairly strong odor of an alcoholic beverage coming from within the vehicle. I remember it being kind of a cool, crisp night and I was just hit with an odor as the doors opened."

that the defendant was intoxicated when he interviewed him at the hospital.

At Boston Medical Center, Dr. Christopher Amanti examined the defendant and smelled alcohol emanating from him. Dr. Harpaul Sandhu assisted with the defendant's treatment, and he also noticed that the defendant's breath smelled of alcohol. Both doctors opined that the defendant was intoxicated. In fact, Sandhu testified that, in his opinion, the defendant was "very drunk."

A State Police collision analyst later determined that the defendant's truck had hit Bui from the rear, when Bui was traveling on a bicycle in a straight line on the right hand side of the road. At the time, the defendant was traveling at least fifty miles per hour; the collision knocked the victim's body 154 feet from the point of impact. The speed limit in that portion of the road was thirty miles per hour.

During his opening statement, defense counsel told the jury that Gregory Feeney, the defendant's business partner, would testify to the defendant's whereabouts from approximately 6 P.M. to 10 P.M. on September 13, 2014. Specifically, counsel told the jury they would hear testimony from the defendant's business partner that the two men were at a community meeting and that there was a back and forth between and among people engaged in the meeting, an "intellectual exercise" in the late afternoon

and early evening -- with the inference that no alcohol was consumed.

In fact, the defense never called Feeney to testify, because counsel learned midway through trial that the defendant was not one of the owners of Slate; as a result, it was counsel's belief that, if Feeney testified, that information would discredit the defendant.  As a result, the jury never heard any evidence regarding the defendant's activities between approximately 6 P.M. and 9:48 P.M. on the night in question.[6]

The prosecutor made the following statement during his closing argument:

> "Last week [defense counsel] stood up in front of you and told you you'd receive some evidence about where Michael Ahern was between [5] P.M. and [9:48] P.M.  You didn't receive any of that evidence.  The only thing you heard is that he dropped off Mary Pierce after they were at a bar sometime around [5:45] or [6] P.M.
>
> "You know at [5] P.M. he was at Sel Delaterre and he was drinking and the next time he pops up on the grid, it's [9:48] P.M. and he's at a bar and he's drinking.  That's all you know about his whereabouts. Apply your common sense.  When you do that, when you're diligent and you go through the video, you're going to notice a couple of things and I'm going to ask you very specifically how to do this.
>
> "Pull this television up to the table.  Sit around it, all of you.  Take out a piece of paper, use notes, watch each video and count what goes up to his mouth, count what touches his lips."

---

[6] The defendant ultimately did not call any witnesses.

The prosecutor then went slowly through the video evidence, pointing to each occasion where the defendant was drinking or appeared to be drinking; he encouraged the jurors to do the same thing during deliberations.  There was no objection to any portion of the prosecutor's closing argument.  The jury thereafter returned a verdict of guilty on the charge of homicide by a motor vehicle while under the influence of an intoxicating substance.

On March 16, 2017, the defendant filed a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001).  He argued that the prosecutor's statement about the defense's failure to call Feeney constituted improper burden shifting and that his trial counsel was ineffective.[7]  The judge concluded that the prosecutor had impermissibly shifted the burden of proof to the defense and he allowed the motion. The judge analyzed the issue, essentially, as one involving a missing witness and viewed the prosecutor's argument as calling for the jury to draw a negative inference from the defense's

---

[7] The defendant also argued that defense counsel had been ineffective when he told the jury in his opening that Feeney would testify and then failed to call him as a witness.  The judge rejected that claim, concluding that "trial counsel's decision against calling Mr. Feeney was a reasonable strategic decision where the testimony threatened to harm the [d]efendant's case."  The defendant does not challenge that decision here.

failure to call Feeney as a witness. In the judge's view, the argument created a substantial risk of a miscarriage of justice.

2. Discussion. "We review the allowance of a motion for a new trial for abuse of discretion or error of law," Commonwealth v. Downey, 65 Mass. App. Ct. 547, 552 n.12 (2006), accepting all of the judge's findings "if supported by the evidence," Commonwealth v. Scott, 467 Mass. 336, 344 (2014). We pay particular deference to the motion judge where, as here, he was also the trial judge. Id. However, because there was no objection to the prosecutor's closing argument, we review to determine whether there was error and, if so, whether the error created a substantial risk of a miscarriage of justice. See Commonwealth v. Harris, 481 Mass. 767, 777 (2019); Commonwealth v. Ferreira, 460 Mass. 781, 788 (2011).

"In closing argument, a prosecutor may argue 'forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence.' Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). In doing so, the prosecutor may not shift the burden of proof or argue that the defendant has any affirmative duty to prove his innocence." Commonwealth v. Fernandes, 478 Mass. 725, 741 (2018). However, "[i]f he speaks with propriety on matters on the record before the jury, a prosecutor may properly comment on the trial tactics of the

defence and on evidence developed or promised by the defence." Commonwealth v. Dunker, 363 Mass. 792, 800 (1973).

"Closing arguments must be viewed 'in the context of the entire argument, and in light of the judge's instruction to the jury, and the evidence at trial.' [Commonwealth v. Braley, 449 Mass. 316,] 328-329 [(2007)], quoting Commonwealth v. Colon-Cruz, 408 Mass. 533, 553 (1990)." Commonwealth v. Muller, 477 Mass. 415, 431 (2017). Here, defense counsel promised in his opening statement that Feeney would testify as to the defendant's whereabouts for a substantial portion of the evening; Feeney was never called. As a result, the prosecutor was entitled to note in his closing argument the absence of that evidence from the record. See Commonwealth v. Tavares, 27 Mass. App. Ct. 637, 642-643 (1989) ("Although defense counsel in his opening stated that he would produce witnesses who were with the defendant at 11 P.M. on the night of the incident, none was produced. After the prosecutor, in closing, referred to the defendant's stated intention in opening argument to produce witnesses, the defendant moved for a mistrial. . . . In view of the defendant's opening argument and his claims of alibi, the prosecutor's remarks were not improper").

Significantly, the Supreme Judicial Court recently reiterated, in the context of an allegation that the prosecutor's argument was burden shifting, "'[a] prosecutor is

entitled to emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case, even though he [or she] may, in so doing, prompt some collateral or passing reflection on the fact that the defendant declined to testify.' Commonwealth v. Nelson, 468 Mass. 1, 12 (2014), quoting Commonwealth v. Feroli, 407 Mass. 405, 409 (1990)." Commonwealth v. Collazo, 481 Mass. 498, 503 (2019).

Furthermore, as the judge emphasized in his findings, the promised witness would not have testified to a time that was particularly relevant to the crime charged. The accident occurred at midnight, and the witness left the defendant before he walked into Slate. And, after the challenged comment, the prosecutor's argument examined the defendant's behavior at Slate in detail.

It is significant here that experienced defense counsel did not object to the argument. See Commonwealth v. Montez, 450 Mass. 736, 748 (2008) ("'Although not dispositive of the issue, the absence of [an objection on this precise point and the absence of a request for a curative instruction] from experienced counsel is some indication that the . . . substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.' Commonwealth v. Toro, 395 Mass. 354, 360 (1985). Moreover, the judge's forceful instruction that the defendant is presumed innocent, that he does not have to prove

his innocence, and that the Commonwealth must prove each essential element of the crimes charged beyond a reasonable doubt mitigated any potential prejudice.  [Kozec, 399 Mass. at 517]").  Here, too, the judge explicitly and appropriately charged the jurors, both before and after closing arguments, that arguments of counsel are not evidence and should not be regarded as such.

Finally, even were we to accept the defendant's contention that the prosecutor's comment improperly asked the jury to infer, from the absence of the promised evidence, that the defendant was drinking between 6 P.M. and 10 P.M., we see no risk of a miscarriage of justice.  The evidence here was overwhelming.  The jury viewed video that showed the defendant drinking at least one, and at least part of another, bottle of champagne at a bar shortly before the accident.  The Commonwealth offered the testimony of four State Police officers, an EMT, and two emergency room doctors who opined that the defendant was intoxicated when they spoke with him shortly after he struck Bui with his truck while speeding on Morrissey Boulevard in Dorchester that night.  No other element of the crime charged was at issue.  In addition, there was considerable evidence of consciousness of guilt.  The defendant gave conflicting accounts of his behavior, responding at least once

that he had nothing to drink and on other occasions saying that he had one beer or "had one drink at work."

Certainly, we see no risk of a miscarriage of justice in the jury's verdict.  For all these reasons, we conclude that the judge abused his discretion in allowing the defendant's motion for a new trial; the order is therefore reversed.

<u>So ordered</u>.