NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12060


COMMONWEALTH  vs.  STEVEN ANDRE.



Suffolk.     November 8, 2019. - April 2, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.


Homicide.  Firearms.  Evidence, Hearsay, Business record, Prior
    misconduct, Firearm.  Practice, Criminal, Capital case,
    Motion to suppress, Instructions to jury, Argument by
    prosecutor.



Indictments found and returned in the Superior Court
Department on January 7, 2011.

A pretrial motion to suppress evidence was heard by Charles
J. Hely, J., and the cases were tried before Christine M.
McEvoy, J.


William S. Smith for the defendant.
Darcy Jordan, Assistant District Attorney (John P. Pappas,
Assistant District Attorney, also present) for the Commonwealth.


LOWY, J.  A Suffolk County grand jury indicted the

defendant, Steven Andre, on two counts of murder in the first

degree, as well as on counts of possession of a firearm without

a license, assault by means of a dangerous weapon, and armed

robbery. Before trial, the defendant filed a motion to suppress evidence that police discovered upon executing several search warrants, which the motion judge denied. A jury convicted the defendant of both counts of murder on the theory of deliberate premeditation, as well as the three other charges, and the trial judge sentenced him to life imprisonment without the possibility of parole.[1]

On appeal, the defendant seeks reversal, assigning error to (1) the motion judge's denial of the defendant's motion to suppress evidence; (2) the trial judge's admission in evidence of a document that constituted inadmissible hearsay and failure to give the requisite jury instruction; (3) the trial judge's admission of testimony concerning firearms, which were allegedly dissimilar to the murder weapon, that the defendant possessed a week prior to the murders; (4) the trial judge's jury instruction regarding the firearms testimony, which he argues created a substantial likelihood of a miscarriage of justice; and (5) the prosecutor's improper statements made in his closing argument, allegedly prejudicing the defendant and violating his constitutional rights. The defendant also requests that we

---

[1] The judge also sentenced the defendant to a term of life imprisonment for armed robbery, and prison terms of from four to five years for possession of a firearm without a license and assault by means of a dangerous weapon, each to run concurrently with the murder sentence.

exercise our power pursuant to G. L. c. 278, § 33E, to reduce the murder verdicts or to grant a new trial. Finding neither reversible error nor a reason to exercise our authority under G. L. c. 278, § 33E, we affirm.

Background. We summarize the facts the jury could have found, reserving some details for later discussion.

1. The murders. On September 6, 2010, Angel Acevedo and Jenret Appleberry were fatally shot in their apartment in Chelsea (apartment). On the evening of September 5, the victims had been at the apartment with their roommate, Luis Rodriguez, and Rodriguez's five year old son.[2] The defendant arrived at the apartment after midnight on September 6. At some point thereafter, Rodriguez and his son went to sleep in Rodriguez's bedroom with the lights off. The victims and the defendant remained in the living room. Between 1 and 2 A.M., the sound of two gunshots awakened Rodriguez. The defendant then entered Rodriguez's bedroom, turning on the light with one hand, and pointing a gun at Rodriguez and Rodriguez's son with his other hand. At gunpoint, the defendant forced Rodriguez, who was holding his son and refused to put him down, to search through the victims' bedrooms for money. The defendant told Rodriguez that he had heard that there was $50,000 somewhere in the

---

[2] There were two other individuals at the apartment that night, but they left before the murders occurred.

apartment, that the defendant had been watching the apartment for about two weeks, and that someone offered to pay him $25,000 to kill the victims because they were informants. Even though Rodriguez said he did not know about any money, the defendant threatened to kill both Rodriguez and Rodriguez's son if Rodriguez's son looked at him or if Rodriguez did not reveal the money's location.

The defendant then directed Rodriguez to go into the living room to search for shell casings. Once in the living room, Rodriguez saw the victims' bodies. The defendant took money from Acevedo's pocket, ripping it in the process. The defendant told Rodriguez to use a shirt to wipe down anything the defendant may have touched, and Rodriguez complied. From the living room, the defendant took a PlayStation 3 gaming console (PS3) and put it into a suitcase he took from a closet.[3] While still at the apartment, the defendant used Rodriguez's cell phone, telling the person on the other line, "it's done."

The defendant eventually let Rodriguez and his son leave the apartment, at which point they walked to Rodriguez's

---

[3] The defendant also took a gun from under Appleberry's mattress and between $300 and $500 in cash and "crack" cocaine from Rodriguez. Rodriguez testified that following the murders, an Xbox gaming console that Appleberry kept in his bedroom was also missing.

father's house.  Approximately six hours later, Rodriguez's parents reported the shootings to the police.[4]

2.  Police investigation.  When the police arrived at the apartment on September 6, 2010, the victims' bodies were in the living room.  Appleberry had been shot in the head at close range, and Acevedo had been shot three times in the head.  There were no signs of forced entry.  After Rodriguez identified the defendant as the person who committed the murders, the police arrested the defendant and executed a search warrant at the apartment where he lived with his girlfriend and his cousin.  In the defendant's bedroom, the police found a gold, square earring and a white watch.  In his cousin's bedroom, the police found a PS3 and a different gold earring.  Appleberry's family identified the watch and an earring as belonging to Appleberry.[5] The PS3 was also later linked to Appleberry.[6]

---

[4] At trial, Rodriguez initially testified that he called 911, but later admitted, after defense counsel refreshed his memory using Rodriguez's grand jury testimony, that his parents contacted the police.

[5] The Commonwealth put forth evidence insinuating that the gold earring found in the bedroom of the defendant's cousin belonged to Acevedo.  The Commonwealth, however, did not seize that earring, and the record does not reflect that anyone positively identified the photograph of the side of the earring as belonging to Acevedo.

[6] The birthday, security question, and e-mail address registered with the account matched that of Appleberry.  In addition, when the police turned on the PS3, the screen

Discussion. 1. Standard of review. Upon a defendant's direct appeal from a capital conviction, we conduct a plenary review of the record for error pursuant to statutory mandate. See G. L. c. 278, § 33E. Where we discern an error to which the defendant did not object at trial, we review for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Gonzalez, 469 Mass. 410, 415-416 (2014). Where the record reflects an error that the defendant preserved below, we apply the ordinary standard of review ascribed to errors of that type in all appeals. See Commonwealth v. Upton, 484 Mass. 155, 160 (2020).

2. Motion to suppress. When reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error, but conduct an independent review of [the] ultimate findings and conclusions of law" (quotation and citation omitted). Commonwealth v. Colon, 449 Mass. 207, 214, cert. denied, 552 U.S. 1079 (2007). We recite the facts as the motion judge found them, supplemented by certain necessary, uncontested facts from the motion hearing record. See id.

Rodriguez spoke to the police on three separate occasions in the days following the murders: on September 6, 7, and 11, 2010. On September 6, Rodriguez told the police that two masked

_____

displayed a friend request to "A-Rock_031." "A-Rock" was one of Acevedo's nicknames.

men shot his roommates. Based in part on Rodriguez's statements, the police applied for and received search warrants for the apartment and for the victims' and Rodriguez's cell phones. On September 7, the police interviewed Rodriguez's young son, who said that only one of the men who entered the apartment was masked. Later that day, the police confronted Rodriguez with the inconsistencies between his and his son's statements, but Rodriguez maintained that there were two masked men.

Finally, on September 11, 2010, Rodriguez informed the police that the defendant had committed the murders alone. Rodriguez also told the police that he lied initially because he feared someone would kill him and his son. Based in part on Rodriguez's newest statements, State police Trooper Kevin Sweeney applied for and received five additional search warrants.[7] In the affidavits supporting each of the five additional search warrant applications, Sweeney omitted both Rodriguez's prior contradictory statements and the statements Rodriguez's son made to police.

Prior to trial, the defendant moved to suppress the evidence seized pursuant to the latter five search warrants.

---

[7] The search warrants covered the defendant's cell phone records, apartment, and purported vehicle, as well as the PS3 recovered from the defendant's apartment.

Citing Franks v. Delaware, 438 U.S. 154 (1978), the defendant argued that material omissions in the affidavits supporting the search warrants rendered the search warrants invalid. The record is unclear both whether the defendant's motion contained a request for a hearing under Franks to determine the veracity of the search warrants and whether the hearing that the defendant received constituted a Franks hearing. Id. at 155-156. The motion judge, however, denied the defendant's motion, concluding that the omission of Rodriguez's and his son's prior statements in the warrant affidavits did not "demonstrate that the warrant affidavits were knowingly or recklessly false on the essential facts that were material to probable cause for the warrants."[8] On appeal, the defendant argues that the judge applied the incorrect standard.

The defendant is entitled to a Franks hearing only if he makes two "substantial preliminary showing[s]." Commonwealth v. Long, 454 Mass. 542, 552 (2009), S.C., 476 Mass. 526 (2017), quoting Franks, 438 U.S. at 155. First, the defendant must demonstrate that the affiant included "a false statement knowingly and intentionally, or with reckless disregard for the truth" or intentionally or recklessly omitted material in the

---

[8] The motion judge further concluded that "[t]his is not a case of material distortion of a defendant's statement as in Commonwealth v. O'Dell, 392 Mass. 445, [448-449] (1984)."

search warrant affidavit. Long, supra, quoting Franks, supra at 155-156. Second, the defendant must show that "the allegedly false statement is necessary to the finding of probable cause," Long, supra, quoting Franks, supra at 156, or that the inclusion of the omitted information would have negated the magistrate's probable cause finding, see Commonwealth v. Corriveau, 396 Mass. 319, 334-335 (1985) (affidavit with omitted material "would not have conveyed a significantly different message" regarding probable cause from that in submitted affidavit without omitted material). See also United States v. McLellan, 792 F.3d 200, 208 (1st Cir.), cert. denied, 136 S. Ct. 494 (2015), quoting United States v. Rigaud, 684 F.3d 169, 173 n.5 (1st Cir. 2012) ("In the case of an omission, this means establishing that the inclusion of the omitted information 'would have led to a negative finding by the magistrate on probable cause'" [emphasis in original]).

If a Franks hearing is ordered, the defendant must meet the same two-prong test by a preponderance of the evidence (as opposed to the "substantial preliminary showing" already demonstrated). See Long, 454 Mass. at 552. As to the second prong, "where an omission forms the basis for a Franks challenge, the judge considers whether the affidavit, supplemented by the omitted information, furnishes probable cause." Id. at 553. If the judge finds probable cause lacking,

the judge must void the warrant and suppress the evidence and any "fruits thereof."  Id.

The defendant here would not have succeeded at a Franks hearing because, even if he sufficiently demonstrated that the affiant had intentionally or recklessly omitted from the latter five search warrants the statements that Rodriguez and his son made to police prior to Rodriguez's September 11 interview, the defendant could not have demonstrated by a preponderance of the evidence that those omissions negated probable cause.[9]

Rodriguez reported to the police that his roommates had been shot and killed at the apartment.  When the police responded to the apartment, they found two identified deceased parties with gunshot wounds.  Rodriguez identified the defendant as the shooter and knew him by name.  The defendant took responsibility for the shootings and ordered Rodriguez to put Rodriguez's son down so that the defendant could shoot

---

[9] The record is unclear whether the defendant's motion to suppress contained a request for a Franks hearing or whether the hearing the defendant received constituted a Franks hearing. Although our conclusion here does not hinge on this issue, the same may not be true for every case.  Thus, it is essential that judges and parties establish a clear record as to whether a Franks hearing is sought and as to whether an adequate showing has been made such that such a hearing is warranted.  See Long, 454 Mass. at 552; Commonwealth v. Amral, 407 Mass. 511, 522 (1990) (judge has discretion "to order an in camera hearing where the defendant by affidavit asserts facts which cast a reasonable doubt on the veracity of material representations made by the affiant concerning a confidential informant").

Rodriguez. The defendant threatened to kill Rodriguez and his family if Rodriguez told anyone what had happened. It was not unreasonable for Rodriguez to refrain from identifying the defendant out of fear of retribution. The motion judge therefore did not abuse his discretion in denying the defendant's motion to suppress.[10]

3. PS3 account memorandum. At trial, Joseph Lamoureux, a security supervisor at Sony Computer Entertainment of America (Sony), testified for the Commonwealth regarding the account information connected to the PS3 seized from the defendant's apartment. After the murders, pursuant to a State police request, Lamoureux searched for and found the account information in Sony's electronic database. Lamoureux then

_____

[10] Even when the reasons for a witness's prior inconsistent statements concerning the identity of the perpetrator seem obvious from the circumstances, the better course is to provide the magistrate reviewing a warrant application with such witness statements that might detract from the strength of the witness's subsequent identification. The nature of the ex parte proceeding prior to any search requires magistrates to rely on the police to provide a complete picture as to the credibility and veracity of witnesses' statements. See Franks, 438 U.S. at 169 ("The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations"). It is then the magistrate's responsibility to determine whether probable cause exists based on the relevant circumstances, and the magistrate will then be able to weed through any conflicting information in making his or her determination. See G. L. c. 218, § 33; Commonwealth v. Connolly, 454 Mass. 808, 813 (2009) (magistrate considers affidavit "as a whole and in a commonsense realistic fashion").

copied the account information[11] from the database to a new document (PS3 memorandum). The Commonwealth sought to admit the PS3 memorandum under the business records exception to the rule against hearsay, to which the defendant objected. Following a voir dire of the witness,[12] the judge ruled that the memorandum was admissible.

a. Business records exception to the rule against hearsay. The business records exception to the rule against hearsay requires the judge to find that the record was made (1) in good faith, (2) in the regular course of business, and (3) before the civil or criminal proceeding in which it was offered began, and (4) that it was "the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable amount of time thereafter." G. L. c. 233, § 78. See Mass. G. Evid. § 803(6)(A) (2019). Such records are "presumed to be reliable and therefore admissible because entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of doing

---

[11] As stated, the Sony memorandum contained the following information, which was later linked to Acevedo: account creation date, account number, first and last name, date of birth, age, security question, and address.

[12] The judge initially agreed with the defendant and sustained the objection, but shortly thereafter she suspended her ruling to conduct the voir dire.

business."  Wingate v. Emery Air Freight Corp., 385 Mass. 402, 406 (1982).  We review the admission of the PS3 memorandum for abuse of discretion.  See Commonwealth v. Denton, 477 Mass. 248, 250 (2017).

The defendant argues that the judge erred in admitting the PS3 memorandum under the business records exception because Lamoureux made the memorandum after criminal proceedings commenced and at the prosecution's request, not in the regular course of business, rendering it inadmissible.[13]  We disagree.

Under the business records exception to the rule against hearsay, the act of printing out or copying an electronic record verbatim into a separate document does not constitute the creation of a new record, even where a party requested the printout or copy for litigation.  See United States v. Burgos-Montes, 786 F.3d 92, 120 (1st Cir.), cert. denied, 136 S. Ct. 599 (2015) ("[T]he physical manner in which the exhibit was generated simply reflects the fact that the business records were electronic, and hence their production required some choice and offered some flexibility in printing out only the

---

[13] The defendant also argues that the judge erred in failing to make the four preliminary factual determinations required to admit in evidence a document under the business records exception.  This argument is unavailing, however, because "[a] judge's decision to admit the records implies these requisite findings under G. L. c. 233, § 78."  Beal Bank, SSB v. Eurich, 444 Mass. 813, 815 (2005).

requested information").  Therefore, contrary to the defendant's argument, the proper inquiry is whether the underlying electronic record, not the printout or copy, satisfies the foundation for the business records exception.  We conclude that so long as an electronic record satisfies the business records exception, a printout or verbatim copy of such an electronic record also satisfies the business records exception, even if the electronic record was printed out or copied after criminal proceedings commenced or in response to the prosecution's request.  See United States v. Briscoe, 896 F.2d 1476, 1494 n.13 (7th Cir.), cert. denied, 498 U.S. 863 (1990) (printouts admissible as business records even when prepared specifically for trial and not in regular course of business because data contained therein was entered into computer at time each call was placed and maintained in regular course of business); United States v. Sanders, 749 F.2d 195, 198 (5th Cir. 1984) (printouts made in preparation of litigation admissible where printout did not sort, compile, or summarize data).

The defendant does not contend that Sony's electronic records did not satisfy the business records exception, nor is there any evidence in the record to even suggest as much.[14]  At

---

[14] Although the Commonwealth admitted that the actual electronic records on which Lamoureux based his memorandum were no longer accessible at the time of trial, the defendant does not contend that the electronic records were not made in good

the time that Lamoureux searched for the relevant PS3 account information, Sony kept electronic records of registered user account information in the ordinary course of business. The PS3 account information was entered on March 4, 2010, before litigation commenced, and the defendant does not contend, nor is there any indication, that it was not Sony's regular course of business to make this type of record on that date. Therefore, the electronic record satisfied the business records exception. Because the PS3 memorandum was a verbatim copy of Sony's electronic records, the PS3 memorandum also satisfies the business records exception to the rule against hearsay.[15] The judge did not abuse her discretion by admitting it.[16]

b. <u>Jury instruction</u>. Under G. L. c. 233, § 78, when a judge admits a record under the business records exception to the rule against hearsay, "all other circumstances of the making

---

faith. Accordingly, the records' unavailability does not have any impact on our conclusion.

[15] We note that the defendant does not contest that the verbatim copy was made in good faith. Indeed, during oral argument, counsel stated that he was not arguing that there was anything "untoward on this record."

[16] The defendant also makes a passing argument that because Lamoureux created the PS3 memorandum at the behest of the police and, thus, literally in anticipation of litigation, the memorandum was testimonial. This argument is unavailing. Given our conclusion that the PS3 memorandum was not a newly created business record, but instead a copy of a prior business record, the PS3 memorandum was not created in anticipation of litigation.

thereof, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight and . . . in a criminal proceeding all questions of fact which must be determined by the court as the basis for the admissibility of the evidence involved shall be submitted to the jury, if a jury trial is had for its final determination" (emphasis added).  We have yet to explicitly determine for what purpose the jury consider the questions of fact undergirding the admission of the business record, and we take the opportunity to do so now.  Judges must submit to the jury such questions of fact, not for the jury to redetermine admissibility, but to evaluate what amount of weight to accord the business record.[17]  In other words, unlike the

---

[17] We provide an example of an appropriate jury instruction:

"There are records which were admitted in this trial which will go to the jury room with you.  When considering what, if any, weight to give these records, you may consider the following factors:

"(1) That the record was made in good faith;

"(2) That it was made in the regular course of business;

"(3) That it was made before the beginning of this criminal proceeding; and

"(4) That it was the regular course of business to make such a record at the time of such act, transaction, occurrence, or event, or within a reasonable time thereafter."

See G. L. c. 233, § 78; Mass. G. Evid. § 803(6)(A) & note (2019).

situation with the humane practice doctrine, statements of coconspirators, or dying declarations, the jury need not engage in finding the legal foundation for admitting business records as an exception to the rule against hearsay before considering the records.  Rather, the jury may consider the evidentiary foundations for admission of business records as it affects the weight of the evidence.  Contrast Commonwealth v. Rakes, 478 Mass. 22, 36-37 (2017), citing Commonwealth v. Bright, 463 Mass. 421, 426-427, 432 (2012) (before jury can consider joint venturer's statement as bearing on defendant's guilt, jury must first make their own independent determination, based on preponderance of evidence other than statement itself, that joint venture existed and that statement was made during and in furtherance thereof); Commonwealth v. Caillot, 454 Mass. 245, 263-264 (2009), cert. denied, 559 U.S. 948 (2010), quoting Commonwealth v. Cryer, 426 Mass. 562, 571 (1998) ("Under the Commonwealth's 'humane practice,' if the voluntariness of a defendant's statement is a live issue at trial, the judge must instruct the jury that the Commonwealth has the burden of proving beyond a reasonable doubt that the statement was made voluntarily and that the jurors must disregard the statement unless the Commonwealth has met its burden"); Commonwealth v. Nesbitt, 452 Mass. 236, 251 n.16 (2008), S.C., 459 Mass. 1005 (2011), quoting Commonwealth v. Key, 381 Mass. 19, 22 (1980)

("Under traditional Massachusetts procedure, the judge and then the jury are to determine whether the requirements for a dying declaration have been established by a preponderance of the evidence").

The defendant argues that the judge erred by failing to instruct the jury to make the four preliminary findings required to admit a document under the business records exception before considering the document.  See G. L. c. 233, § 78; Mass. G. Evid. § 803(6)(A).  We agree that the judge's failure to provide guidance to the jury regarding how they should weigh the business records constituted error.  We are confident, however, that the error did not create a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Evans, 438 Mass. 142, 157 (2002), cert. denied, 538 U.S. 966 (2003) (unpreserved claim of error in jury instruction reviewed for substantial likelihood of a miscarriage of justice); Commonwealth v. Ruddock, 428 Mass. 288, 292 n.3 (1998); Commonwealth v. Devlin, 335 Mass. 555, 563 (1957), S.C., 363 Mass. 171 (1973) (where no objection was made, lack of jury instruction on questions of fact did not amount to reversible error).  Even if the judge had properly submitted the requisite questions to the jury, and the jury had determined that the PS3 memorandum should have been

accorded less weight, the jury still heard ample other evidence that the defendant killed the victims.[18]

4. Firearms testimony. The defendant also argues that the judge erred in admitting Krista Najarian's testimony regarding her observations of the defendant's prior possession of firearms because the description of the guns she observed the defendant holding was "wholly different" from Rodriguez's description of the murder weapon. During trial, the Commonwealth introduced evidence that the unrecovered murder weapon was a nine millimeter firearm. Rodriguez testified that he believed the defendant had a "gray and black" gun, which had a "flat shape" and no barrel, on the night of the murders. Najarian thereafter testified that about a week prior to the murders, she observed the defendant take two "dark," "regular size guns" out of his waistband and put them under the seat of her car.[19] Najarian further testified that she did not know what kind of guns they

_____

[18] Such evidence included the defendant's statement to police that he was at the apartment on the night of the murders; Rodriguez's testimony identifying the defendant as the murderer and his first-hand account of the immediate aftermath of the murders, which was corroborated by physical evidence found at the murder scene; and the seizure of Appleberry's jewelry and Acevedo's PS3 from the defendant's apartment.

[19] Najarian also testified that the defendant often took her car during the summer of 2010 and that after the night on which she observed the defendant place the guns under her car seat, the defendant kept her car until after the murders. This car was also the subject of one of the search warrants.

were, nor did she know anything about guns.  Following

Najarian's testimony and at the close of the evidence, the judge

provided limiting instructions to the jury.

a.  Admission of firearms testimony.  We review a judge's

evidentiary rulings for an abuse of discretion.[20]  See

Commonwealth v. Rosa, 468 Mass. 231, 237 (2014); Commonwealth v.

McGee, 467 Mass. 141, 156-157 (2014).

We have long held that "[e]vidence of prior bad acts is not

admissible to show that the defendant has a criminal propensity

or is of bad character.").  Commonwealth v. Otsuki, 411 Mass.

218, 236 (1991), quoting Commonwealth v. Robertson, 408 Mass.

747, 750 (1990).  Such evidence may be admissible, however, so

long as it is relevant for some other proper purpose and its

probative value is not substantially outweighed by the risk of

prejudice to the defendant.[21]  See Commonwealth v. Tavares, 482

---

[20] The Commonwealth filed a motion in limine to permit this testimony, which the defendant opposed, but the defendant did not renew his objection at trial.  At trial, however, the judge recognized defense counsel's previous objection and acknowledged that the objection was preserved.  Thus, although the trial took place prior to Commonwealth v. Grady, 474 Mass. 715, 719 (2016), we conclude that the defendant's appellate rights are preserved. See id. (prospectively, "[w]e will no longer require a defendant to object to the admission of evidence at trial where he or she has already sought to preclude the very same evidence at the motion in limine stage, and the motion was heard and denied").

[21] We need not decide whether the new standard we articulated in Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014), applies retroactively ,because under either standard, the judge here did not abuse her discretion.  See id.

Mass. 694, 711 (2019); Commonwealth v. Valentin, 474 Mass. 301, 306 (2016). In the context of firearms-related evidence, we have often held that such evidence may be admissible to demonstrate the defendant's access to or familiarity with firearms. See Commonwealth v. Vazquez, 478 Mass. 443, 449-450 (2017); Commonwealth v. Bonnett, 472 Mass. 827, 841 (2015), S.C., 482 Mass. 838 (2019); McGee, 467 Mass. at 157; Commonwealth v. Ridge, 455 Mass. 307, 322-323 (2009). While this is true, such evidence also "creates a risk that the jury will use the evidence impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged." Valentin, supra, quoting McGee, supra at 156.

Before admitting such evidence, the judge should articulate the precise manner in which the evidence of the defendant's access to and familiarity with firearms is relevant and material to the facts of the particular case. See Mass. G. Evid. § 401; P.C. Giannelli, Understanding Evidence 168 (5th ed. 2018). However, the fact that the firearms-related evidence may be relevant to a specific, nonpropensity purpose does not render the evidence admissible. The judge must then consider and articulate "the risk that the jury will ignore the limiting

---

(clarifying that "'other bad acts' evidence is inadmissible where its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk").

instruction and make the prohibited character inference" and use the evidence for an inadmissible purpose, such as propensity. Giannelli, supra. See Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014), quoting Commonwealth v. Johnson, 35 Mass. App. Ct. 211, 218 (1993), S.C., 43 Mass. App. Ct. 509 (1997) (prior bad acts evidence is "inherently prejudicial"). This risk is at its zenith in an identification case because the jury may incorrectly infer that if the defendant possessed a firearm previously (or subsequently), he is probably the person who committed the crime charged. This is especially true when the firearms-related evidence is not connected to the firearm used in the commission of the crime charged by either forensic evidence or eye witness testimony. Once the judge articulates these considerations on the record, it is then within the judge's discretion to determine whether the probative value of the firearms-related evidence is outweighed by the risk of prejudicial effect on the defendant. See Crayton, supra; Mass. G. Evid. § 403.

In this case, the judge did not abuse her discretion in admitting Najarian's testimony. Contrary to the defendant's contention, Najarian's and Rodriguez's descriptions of the defendant's firearms were not "wholly different." Najarian described the firearms as "dark," while Rodriguez described the murder weapon as "gray and black." In addition, Najarian

observed the defendant with the firearms one week prior to the murders. Nevertheless, even if the judge had erred in admitting the evidence, that error would not have prejudiced the defendant. See Commonwealth v. Barbosa, 463 Mass. 116, 121 (2012). Given the amount of properly admitted evidence of the defendant's guilt, see note 18, supra, the scant attention Najarian's firearms testimony received at trial,[22] and the judge's limiting instruction,[23] any error "had at most a 'very slight effect' on the jury." Barbosa, supra at 124, quoting Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994).

b. Jury instructions. At the conclusion of the evidence, the judge gave another limiting instruction as to Najarian's firearms testimony: "If you credit that testimony, you may consider it for limited purposes, which I've explained to you before, that is, . . . whether or not the defendant had access to guns and familiarity with violence" (emphasis added). Because there was no objection, we review any error for a

---

[22] Najarian's testimony regarding the defendant's prior possession of firearms only comprised three pages of over sixty pages of testimony. In addition, the prosecutor briefly mentioned the acquaintance's testimony during his closing argument, but did not argue that the weapons-related evidence demonstrated access to or knowledge of firearms.

[23] Immediately following Najarian's testimony, the judge instructed the jury to first determine whether they credited the testimony and, if they did, to then only consider the testimony for the limited purposes of the defendant's access to guns or familiarity with weapons.

substantial likelihood of a miscarriage of justice. See Commonwealth v. Rodriquez, 461 Mass. 100, 106 (2011). Here, the judge clearly misspoke; however, such a misstatement does not rise to the level of substantial likelihood of a miscarriage of justice.

"We evaluate jury instructions as a whole and interpret them as would a reasonable juror." Commonwealth v. Kelly, 470 Mass. 682, 697 (2015). Immediately following the Commonwealth's direct examination of Najarian, the judge gave a lengthy and detailed limiting instruction. See Commonwealth v. Holley, 478 Mass. 508, 533 n.25 (2017), quoting McGee, 467 Mass. at 158 (where firearms-related evidence excluded as pertaining to possible murder weapon, contemporaneous limiting instruction often required); Commonwealth v. Facella, 478 Mass. 393, 408-409 (2017) (no abuse of discretion where judge gave "forceful limiting instruction[] . . . [i]mmediately following" testimony); Barbosa, 463 Mass. at 126, citing Ridge, 455 Mass. at 323 (jury presumed to follow limiting instruction). Moreover, the judge's misstatement occurred in the middle of her otherwise complete and accurate jury instructions on prior bad act evidence. Indeed, immediately prior to and following her misstatement, the judge correctly instructed the jury not to consider any evidence of the defendant's alleged drug distribution activities, gang affiliation, or possession of guns

as proof that the defendant "had a criminal propensity or bad character."  See <u>Commonwealth</u> v. <u>Kosilek</u>, 423 Mass. 449, 455 (1996) (jury instruction "misstatement is preceded and followed by accurate statements").  See also <u>Vazquez</u>, 478 Mass. at 449-450 ("judge's instruction forbade the jury from using the evidence in ways that were unduly prejudicial to the defendant").  Even if the jury had considered Najarian's testimony for an improper purpose, her testimony was not so pivotal as to create a substantial likelihood of a miscarriage of justice.

5.  <u>Prosecutor's closing argument</u>.  The defendant contends that the prosecutor made several improper statements during his closing argument, which individually and collectively went to the heart of the case and prejudiced the defendant. Specifically, the defendant argues that the prosecutor improperly (1) disparaged the defendant's right to counsel; (2) insinuated that the jurors had a duty to convict the defendant despite doubts as to someone else's involvement; and (3) appealed to the jury's sympathy.[24]  The defendant objected to the

---

[24] The defendant also argues that the prosecutor improperly proclaimed his belief that the defendant received a "fair trial" and, thus, he improperly and inferentially referenced the defendant's appellate rights.  The prosecutor stated:  "And now at this point, at this time you've heard all the evidence in the case in what I suggest to you has been a full and fair trial for Steven Andre in which he's been represented by an experienced attorney."  We are unable to see how this statement referenced,

first alleged improper argument; thus, we review for prejudicial error.  See Commonwealth v. Alvarez, 480 Mass. 299, 305, S.C., 480 Mass. 1015 (2018) (no prejudicial error where error did not influence jury or had "very slight effect" [citation omitted]).  Because the defendant did not object to the latter two statements, should we find them to be erroneous, we review for a substantial likelihood of a miscarriage of justice.  See Vazquez, 478 Mass. at 451.

We consider remarks made during closing "in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury."  Commonwealth v. Felder, 455 Mass. 359, 368 (2009).  The judge here properly instructed the jury that the closing argument was not evidence, and we must presume that the jury understood that instruction.  See Commonwealth v. Kolenovic, 478 Mass. 189, 200 (2017).

a.  Disparagement of defendant's right to counsel.  After mentioning defense counsel's alternate theories of the case, and over defense counsel's objection, the prosecutor stated:  "A skilled, experienced, competent attorney will ask those questions to get you collectively to start focusing on not

---

improperly or otherwise, the defendant's appellate rights. Moreover, we discern no way in which this statement would "have the inescapable effect of reducing the jurors' appreciation of the significance of their deliberations and verdict." Commonwealth v. Walker, 370 Mass. 548, 574, cert. denied, 429 U.S. 943 (1976).

what's before you."  The defendant argues that this statement impermissibly disparaged the defendant's right to counsel because it insinuated that the defense's theory of the case was "merely smoke-blowing by a well spoken, slick defense lawyer."

The prosecutor's comments did not disparage the defendant's right to counsel, nor did it disparage defense counsel personally or her defense strategy overall.  Instead, the prosecutor commented on specific defense tactics, arguing that the jury should not believe the defense's version of events and permissibly urged the jury to focus solely on the evidence actually before them.[25]  See Felder, 455 Mass. at 369 ("read in context, there was no error in the prosecutor's limited references to the attempts by defense counsel to create 'smoke screen[s]'"); Commonwealth v. Jackson, 428 Mass. 455, 463 (1998), S.C., 468 Mass. 1009 (2014) ("prosecutor may comment on defense tactics that the jurors have witnessed themselves"). See generally Commonwealth v. Kozec, 399 Mass. 514, 516 (1987) ("We have never criticized a prosecutor for arguing forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence").  There was no error.

---

[25] The judge also instructed the jury not to "decide the case based on speculation, surmise or conjecture."

b. <u>Insinuation that jury had a duty to convict</u>.  In his closing, the prosecutor posed several rhetorical questions regarding another person's possible involvement in the murders and then stated, "Those are issues for another day, for another jury.  Your issue collectively is this man on this case and at that moment at that time . . . ."  The defendant argues that the prosecutor "craftily" intimated that even if the jurors believed someone else may have been involved in the murders, and thus were hesitant about the defendant's guilt, they should nonetheless convict him and leave the issue of multiple murderers for "another day."

The prosecutor's statement again permissibly asked the jurors not to speculate based on evidence not before them and reminded the jurors that their sole job was to determine the defendant's culpability.  Moreover, the prosecutor also made the challenged statements in response to defense counsel's arguments that two people had been involved in the murders, that Rodriguez lied about the defendant's involvement, and that the police failed to thoroughly investigate anyone other than the defendant.  See <u>Commonwealth</u> v. <u>Bresilla</u>, 470 Mass. 422, 438 (2015) (prosecutor "entitled to respond to defense counsel's criticism of the police investigation"); <u>Commonwealth</u> v. <u>Smith</u>, 450 Mass. 395, 408, cert. denied, 555 U.S. 893 (2008), quoting <u>Commonwealth</u> v. <u>Chavis</u>, 415 Mass. 703, 713 (1993) ("A prosecutor

is permitted to 'make a fair response to an attack on the credibility of a government witness'"). There was no error.

c. Appeal to the jurors' sympathies. The defendant also contends that the prosecutor improperly appealed to the jurors' sympathies by highlighting Rodriguez's emotional state at the time of the murders to explain why Rodriguez failed to call the police immediately.[26] While the prosecutor may have overly emphasized Rodriguez's plight, we must impute to the jurors "[a] certain measure of . . . sophistication in sorting out excessive claims" in closing arguments. Commonwealth v. Taylor, 469 Mass. 516, 529 (2014), quoting Kozec, 399 Mass. at 517. A reasonable juror would understand that the prosecutor intended his remarks to demonstrate that Rodriguez acted reasonably in light of the threats to his five year old son. See Valentin, 474 Mass. at 310-311. There was no error. Even assuming these statements constituted error, the judge properly cured it by instructing the jury that it was their job alone to determine a witness's credibility and that they should not decide the case based on any sympathy they might have had towards a particular side. See Kolenovic, 478 Mass. at 200-201.

---

[26] Specifically, the prosecutor discussed Rodriguez's brother's murder, which occurred less than a month before the murders, and Rodriguez's experience witnessing his roommates' murders, while his son's life was threatened. The prosecutor argued, "And for the [Rodriguezes] of the world fortunate are those who don't walk in his shoes."

6. <u>Review under G. L. c. 278, § 33E</u>. We have reviewed the entire record of this case pursuant to our responsibilities under G. L. c. 278, § 33E. We conclude that there is no basis for reducing the defendant's sentence on the murder conviction or ordering a new trial.

<u>So ordered</u>.